# EXHIBIT A:

# CDC PETITION

**Petition to the Centers for Disease Control and Prevention (CDC)**
**Attention: Jim O'Neill, Acting CDC Director**

**Centers for Disease Control and Prevention**
**1600 Clifton Road, NE**
**Atlanta, GA 30329-4027**

Submitted on behalf of Targeted Justice, Inc., a 501(c)(3) non-profit organization.

**Date**: September 29, 2025

**To**: Jim O'Neill, Acting Director, Centers for Disease Control and Prevention (CDC)
Subject: Petition for Recognition, Surveillance, and Guidance Regarding Civilian "Havana Syndrome" (Anomalous Health Incidents) Cases

Dear Director O'Neill:

Targeted Justice, Inc., through this formal petition, urgently requests that the CDC recognize and respond to the emerging public health issue of "Havana Syndrome," also known as Anomalous Health Incidents (AHIs), among U.S. civilians. We respectfully petition the CDC to take immediate action to formally acknowledge, track, investigate, and mitigate civilian cases of this condition, which to date have gone unaddressed by public health authorities. This petition and its supporting exhibits are submitted for the public record, and will be cited in forthcoming civil litigation on behalf of nine (9) diagnosed civilian plaintiffs. We request that CDC publicly acknowledge receipt of this petition and promptly implement the actions outlined below.

**Background and Supporting Evidence**

Havana Syndrome/AHI refers to a cluster of sudden, unexplained neurological and vestibular symptoms first identified in U.S. diplomats and officials overseas in 2016. It is characterized by an acute onset of strange auditory or sensory phenomena (often directional), followed by neurological symptoms (e.g. vertigo, cognitive deficits) not attributable to other known causes. The U.S. government has studied this phenomenon in its employees: in 2019, the CDC itself conducted an epidemiologic investigation of the initial cases and established a case definition for "Havana Syndrome" incidents. In that CDC report, 15 individuals met the "presumptive case" criteria and 31 were deemed "possible" cases, out of 95 persons evaluated. Despite issuing this document, it

remained unpublished and un-shared with the physicians, and was obtained via FOIA, indicating concealment of information. (***Exhibit A***).

Another FOIA request revealed that the CDC has neither tracked civilian AHI cases nor issued any public health guidance on this condition. ***Exhibit B*** is a FOIA response dated March 3, 2025, in which CDC acknowledged it had developed a draft internal "Anomalous Health Incidents (AHI) Guidance" as early as March 2022, but withheld that document under deliberative process privilege. In other words, CDC possesses internal guidance on this syndrome but has not published it for medical providers, leaving front-line physicians without official diagnostic criteria or protocols. Indeed, no CDC Health Advisory, case definition, or reporting mechanism exists for civilian Havana Syndrome cases to date, which has led to confusion and missed opportunities to document incidents.

Shockingly, independent analysis by Targeted Justice indicates that this withheld "draft guidance" is not classified or sensitive at all – it has been identified as essentially a copy of a publicly available 2022 Department of Labor bulletin on handling AHI cases. Specifically, DOL's FECA Bulletin No. 22-03 (issued January 12, 2022), titled *"Processing Claims for Anomalous Health Incidents (AHI) under the Federal Employees' Compensation Act"*, appears to match the content of the CDC's withheld page. This bulletin provided instructions on how federal injury compensation claims related to AHIs should be processed, treating AHIs as traumatic brain injuries and outlining medical evaluation requirements. In other words, the CDC withheld a document that was already openly published by another federal agency, under the pretext of internal deliberation.

This discovery suggests deliberate concealment of pertinent information. Rather than acknowledge that CDC had *any* guidance – even a draft based on interagency information – the FOIA response hid it from public release, despite the document's public availability elsewhere. Such an act raises serious concerns about transparency. It gives the appearance that CDC is unwilling to even admit it possesses guidance on AHIs, perhaps to avoid responsibility or public scrutiny. Concealing public-domain information during a FOIA process undermines trust and suggests that the agency may be withholding more substantive analysis or data on AHIs.

Expert investigations have determined that this combination of symptoms and clinical findings is unique and novel, not attributable to any known neurological or medical condition. The 2020 National Academies of Sciences (NASEM) panel established the most plausible mechanism as follows: "directed, pulsed radiofrequency energy appears to be the most plausible mechanism in explaining these cases, noting the "significant

suffering and debility" among victims and emphasizing that known diagnoses could not explain the distinct early symptoms seen in many cases. A September 2022 Intelligence Community Experts Panel echoed the same mechanism and concluded that the signs and symptoms reported in a core set of AHI cases are genuine and *"cannot be easily explained by known environmental or medical conditions"*, indicating an unprecedented syndrome.

Recent evidence shows that Havana Syndrome/AHI is not limited to federal employees or overseas incidents – U.S. civilians on domestic soil have also been diagnosed with this condition. Targeted Justice in August 2024 established a Civilian Havana Syndrome/AHI Registry, and the first Civilian Registry Report (January 2025) documented multiple physician-confirmed civilian cases across several states (***Exhibit C***). Among the known civilian cases in that report were seven (7) individuals (3 male, 4 female, including one minor) from five states (AR, IL, CO, NY, RI) who were diagnosed between 2020 and 2024. These cases mirror those of government victims, including one civilian with non-kinetic traumatic encephalopathy (brain injury without concussion history) now on disability. Notably, the Registry Report indicates at least 30 total civilian diagnoses were known by early 2025, though many patients feared coming forward due to concern of government disbelief or retaliation. Despite these documented civilian cases and the serious, ongoing nature of their injuries, the CDC and other health agencies have provided no official recognition or response for civilians afflicted by Havana Syndrome/AHI.

The absence of CDC action has forced civilian victims and independent organizations to fill the gap. For example, Targeted Justice developed and published its own "Diagnostic Guidance for Doctors and Patients" on its website, TargetedJustice.com. However, such stopgap measures are no substitute for formal CDC guidance and surveillance. The January 2025 Civilian Registry Report concluded that "there is no relevant information regarding…diagnostic guidance and management offered to the American public" for this emerging health threat, an unacceptable gap for a condition causing *"progressive neuro-cognitive debilitation"* in its victims.

Because Havana Syndrome/AHI is not recognized as a reportable condition, attempts by physicians to notify public health authorities have been thwarted. In one documented case (***Exhibit D***), a physician in August 2025 reported a confirmed civilian AHI case to state health officials – but with no CDC alert or category for "Havana Syndrome," the report could not be properly logged or escalated. This illustrates the broader systemic failure to capture civilian cases in our national health surveillance. In short, civilian patients are falling through the cracks: they have no formal channel to

report incidents, no CDC guidance to inform their doctors, and no access to the specialized research and treatment programs that federal employees receive.

The failure of the CDC to get involved in the civilian cases of Havana Syndrome/AHI resulted in a gross violation of patient's rights. For example, at the University of Miami Medical Center patients were refused to see a specialist because they were not federal employees. At the same medical institution, a subject matter expert Dr. Michael Hoffer, MD stated to a patient: *"I hope you didn't come all this way and be disappointed, but I am not allowed to diagnose Havana Syndrome victims any longer. The government won't let me"*. These violations are hard to imagine if the CDC acted timely and appropriately. (2023-2024 correspondence and the statement under the perjury of law are available upon request.)

In 2022, another expert, Dr. James Giordano (associated with the Georgetown University in DC at the time) confirmed a civilian diagnosed civilian case of Havana Syndrome and reported it (twice) to the DOD that resulted in zero investigation, - a civilian case that otherwise would be handled by the CDC and the NIH.

The gravity of this situation cannot be overstated. Havana Syndrome/AHI cases involve brain injury-like symptoms and likely exposure to directed, pulsed energy. Civilians affected on U.S. soil deserve the same urgency of public health response as any other emerging health threat. To date, law enforcement and intelligence agencies have largely failed to investigate civilian reports (the FBI declined to investigate five of the seven registry cases), making the public health system's role all the more crucial. The CDC's mandate is to protect public health — this includes recognizing and responding to *anomalous health incidents* affecting the public. Both Congress and scientific experts have started asking questions about civilian victims; it is incumbent on CDC to now act.

**Actions Requested of the CDC**

Accordingly, Targeted Justice hereby petitions the CDC to undertake the following five actions to address civilian "Havana Syndrome"/AHI cases:

1. Formal Recognition of Havana Syndrome/AHI as a Reportable Condition Among Civilians: Acknowledge that physician-diagnosed cases of Havana Syndrome (AHI) are occurring in the civilian population and designate this condition as a reportable health event. This includes working with state and territorial health departments to add AHI (civilian Havana Syndrome) to the list of notifiable conditions or otherwise establish a mechanism for clinicians to report new cases.

Formal recognition will legitimize the diagnosis and enable systematic case collection.

2. Creation or Expansion of a National Surveillance & Reporting System to Include Civilian Cases: Develop and implement a national surveillance program for Havana Syndrome/AHI that includes civilians, or expand any existing federal employee AHI registry to encompass civilian reports. The CDC should coordinate with the Department of Defense and other agencies that maintain AHI registries to ensure all cases (not just federal employees) are captured. This action may involve establishing a centralized Civilian AHI Registry or integrating into existing surveillance networks, and issuing periodic public reports on case numbers and geographic distribution.

3. Publication of Official Diagnostic Guidance for Physicians: Issue formal diagnostic and clinical management guidance to healthcare providers nationwide for recognizing Havana Syndrome/AHI. This guidance should detail the syndrome's case definition, clinical presentation (e.g. acute auditory/vestibular phenomena with subsequent neurological symptoms), recommended diagnostic workups, and reporting procedures. It should draw upon the 2019 CDC case definition (Exhibit A) and subsequent research findings. The guidance must be disseminated publicly (through a CDC Health Advisory, MMWR article, or similar) so that frontline physicians can accurately diagnose and treat potential AHI cases.

4. Training and Alerts for Public Health Officials and Frontline Medical Personnel: Proactively educate state epidemiologists, public health departments, and emergency/frontline clinicians about Havana Syndrome/AHI. CDC should issue official Health Alert Network (HAN) bulletins or other notifications to all state and territorial health departments describing the condition and urging them to be vigilant for civilian cases. State epidemiologists should be trained to investigate reported incidents, and hospitals/clinics alerted to the possibility of AHI in patients with relevant symptom clusters. The goal is to ensure that no legitimate case goes unrecognized or unreported due to lack of awareness. This effort should include offering technical assistance to any state that encounters a suspected civilian AHI case.

5. Access for Civilian Patients to NIH Programs and Treatment Protocols Equivalent to Those for Federal Employees: Coordinate with the National Institutes of Health (NIH) and other relevant federal entities so that civilian Havana Syndrome patients receive the same opportunities for specialized

evaluation, research participation, and care as government-affiliated patients. Currently, NIH and DoD have developed clinical research programs for affected federal personnel (including an NIH intramural research study on AHI that enrolled government employees and their families). We request that CDC facilitate the inclusion of civilian patients in any ongoing AHI clinical trials, medical surveillance programs, or treatment protocols. Civilian victims should, for example, have access to the comprehensive neurological evaluations conducted at the NIH or military hospitals, and any experimental therapies or rehabilitation strategies being offered. Parity of care between federal and non-federal victims is a matter of basic fairness and public health importance.

We emphasize that all five actions above are urgent and interrelated. Together, they will establish a long-overdue framework for addressing this phenomenon among the civilian population. These requests mirror the recommendations made in our Civilian Registry Report, which Congress has been informed of, and align with the U.S. government's existing approach to AHI for its personnel (now to be expanded to all citizens).

In addition to this formal petition, there is a public petition hosted on Change.org – *"CDC & NIH: Recognize, Track, and Investigate Diagnosed Civilian Havana Syndrome / AHI Cases"* – which has drawn growing support from members of the general public across the United States (https://www.change.org/p/cdc-nih-recognize-track-and-investigate-diagnosed-civilian-havana-syndrome-ahi-cases). This broad-based civic effort reflects the urgency and seriousness with which ordinary Americans view this matter. The public petition underscores that concern about AHIs is not confined to a handful of affected individuals or advocacy groups, but represents a widespread call for the CDC to act transparently, to acknowledge the condition, and to fulfill its duty to track and investigate civilian cases of Havana Syndrome/AHI. The alignment of both an official organizational petition and a grassroots public petition highlight the depth of national concern and strengthens the moral imperative for the CDC to respond.

Submission and Acknowledgment

Method of Submission: This petition is being submitted to the CDC Office of the Director via certified mail (with return receipt) to ensure official delivery and record. For additional transparency and tracking, an electronic copy is also being submitted through the CDC's FOIA Public Access Portal (as a public correspondence) and via email to the CDC Director's official inbox. We are simultaneously providing courtesy

copies to the Department of Health and Human Services and select Congressional offices that have shown interest in Anomalous Health Incidents. Media outlets will be notified of the filing of this petition, in keeping with the public interest in this matter.

Acknowledgment Requested: We respectfully request that CDC issue a prompt public acknowledgment of receipt of this petition. This can be a letter or press statement simply confirming that the petition has been received and is under review. Given the importance of this issue to public health and the pending civil litigation involving nine civilian victims, an acknowledgment will demonstrate the CDC's good-faith engagement. We further request that CDC address the substance of this petition in a timely manner (e.g. by outlining what steps will be taken or considered, and on what timeline). Targeted Justice and the affected individuals stand ready to assist and provide further data or testimony as needed.

Please be advised that this petition and its enclosures are part of the public record. We intend to cite this petition, and any CDC response (or lack thereof), in upcoming litigation on behalf of the civilian AHI victims. We sincerely hope that litigation can be avoided or narrowed by constructive action from the CDC to protect civilians going forward. Our organization's goal is to work collaboratively with public health authorities to address this emerging threat.

Conclusion

In summary, Targeted Justice petitions the CDC to recognize "Havana Syndrome" (AHIs) as a real and reportable health condition affecting U.S. civilians, and to mobilize an appropriate public health response. The attached exhibits (A through D) provide unambiguous evidence that civilian cases are occurring and are being overlooked. It is the CDC's mission to lead in such matters. We urge you to treat this petition with the urgency it deserves, as lives and public trust are at stake.

Thank you for your attention to this critical issue. We look forward to your acknowledgment and action.

Sincerely,

*Targeted Justice, Inc.*

Len Ber, MD (Global Medical Director, Targeted Justice, Inc.)
On behalf of Targeted Justice, Inc. and the undersigned civilian petitioners

Enclosures/Exhibits:

- **Exhibit A**: CDC "Cuba Unexplained Events Investigation – Final Report" (2019)
- **Exhibit B**: FOIA Response from CDC (March 3, 2025) [Evidence of CDC's internal AHI guidance draft (March 2022)
- **Exhibit C**: "Collecting Information on Diagnosed Cases of "Havana Syndrome" and its Anomalous Health Incidents (AHI) among Civilians Occurring on US Soil" (January 2025)
- **Exhibit D**: August 2025 Physician Communication to State Health Department [Documenting attempt to report a civilian AHI case].

# EXHIBIT A

# CUBA UNEXPLAINED EVENTS INVESTIGATION – FINAL REPORT

*Havana, Cuba, August 2016 to March 2019*

This report summarizes findings from the CDC investigation to date regarding a symptom cluster among U.S. Government staff and family members stationed in Havana, Cuba.

This analysis is based on data available to the CDC. The findings and interpretations may change if new information becomes available.

Centers for Disease Control and Prevention

12/3/2019

12/3/2019

# CUBA UNEXPLAINED EVENTS INVESTIGATION – FINAL REPORT

*Havana, Cuba, August 2016 to March 2019*

## EXECUTIVE SUMMARY

**Setting:** In late 2016, U.S. Government (USG) employees and their families stationed in Havana, Cuba, began reporting multiple and varying non-specific symptoms, following an unusual auditory or sensory event. Following initial complaints by USG employees, the U.S. Department of State (DoS) requested USG employees and eligible family members (EFMs) report any unusual auditory or sensory events followed by onset of symptoms to the in-country medical team.

**Primary Objectives:** In December 2017, DoS requested CDC conduct an epidemiologic investigation. CDC aimed to 1) systematically analyze all medical records from available sources, 2) establish an epidemiologic case definition for the investigation, and 3) describe the pattern and timing of symptoms relative to time in Cuba.

***Case Definition:*** A review of abstracted records identified onset of symptoms while in Cuba or within two weeks of returning from Cuba. A presumptive case was defined as biphasic onset of symptoms while in Cuba or within two weeks of returning from Cuba, unexplained by past medical history or alternative diagnosis. The initial phase of symptoms included at least one of the following symptoms:

- Head pressure
- Disorientation
- Nausea
- Headache
- Vestibular disturbances
- Auditory symptoms
- Vision changes

The secondary phase had a distinct separate onset from the initial phase and included at least one of the following symptoms:

- Vestibular disturbances
- Cognitive deficits

A possible case was defined as onset of symptoms while in Cuba or within two weeks of returning from Cuba with a biphasic onset of symptoms that did not include vestibular disturbances or cognitive deficits in the secondary phase. A possible case was also defined as a pattern of vestibular disturbances or cognitive deficits with unknown onset and at least one of the following symptoms without alternative explanation:

- Head pressure
- Disorientation
- Auditory symptoms
- Vision changes

Persons who experienced symptoms that did not meet either presumptive or possible case definition were classified as not likely cases.

**Salient Findings:**

***Epidemiological Investigation:*** CDC abstracted existing medical records for 95 persons evaluated by the DoS, University of Miami (UM), University of Pennsylvania (Penn), and National Institutes of Health (NIH) to collect specific information to develop a case definition. Of the 95 persons whose medical records CDC evaluated, 15 had illness that met the criteria for a presumptive case definition. CDC classified 31 others as possible cases and the remaining 49 as not likely to be a case. Non-systematic data collection and the lack of a control population limited the statistical analyses possible.

***Pattern of symptoms:*** The most commonly reported initial symptoms were auditory symptoms (n=13), headache (n=12), and nausea (n=10). Vestibular disturbances and cognitive deficits were the most commonly reported symptoms among all persons (n=42). Overall, 19 persons had enough information to identify a biphasic onset, of whom 79% (n=15) reported a subsequent onset of vestibular disturbance(s) or cognitive deficit(s).

**Conclusions and Follow-up:** This is the first attempt to use information from multiple medical centers to create a case definition that could be critical for conducting a future prospective case-control study and for identifying risk or mitigating factors for this condition. As of December 2018, among the 15 presumptive cases, 9 (60%) persons reported improvement and none reported worsening in their clinical course. (b)(6) (b)(6) (b)(6) The findings and interpretations of this analysis are the product of data available to CDC and could change if new information becomes available.

## SETTING

In late December 2016, a United States Government (USG) employee serving in Havana, Cuba, first presented to their in-country embassy medical unit reporting multiple non-specific symptoms. Reported symptoms included vestibular disturbances, vision changes, cognitive deficits, auditory symptoms, sleep impairment, and headaches.[i] During early February 2017, a second person reported an unexplained onset of similar symptoms. Following the second report, the Department of State (DoS) requested USG employees and eligible family members (EFMs) report any unusual auditory or sensory events followed by onset of symptoms to the in-country medical team. Additional USG employees reported similar unexplained symptoms, some pre-dating the onset of the original report. In response, DoS Bureau of Medical Services conducted initial clinical assessments of USG employees and EFMs reporting symptoms in-country. Clinicians from the University of Miami (UM) were invited to initially examine affected persons in Havana, and they continued to assess and treat self-identified affected persons who were medically evacuated to Miami, FL. The University of Pennsylvania (Penn) evaluated and treated additional self-identified affected persons. In June 2018, the National Institutes of Health (NIH) began systematically evaluating self-identified persons who might have previously sought care at UM, Penn, or both.[ii]

## OBJECTIVES

On December 29, 2017, the DoS Bureau of Medical Services formally requested assistance from the U.S. Centers for Disease Control and Prevention (CDC) to investigate this unexplained phenomenon. DoS requested the following assistance from CDC: 1) lead a scientific inquiry for establishing an epidemiological case definition for the investigation; 2) identify risks and mitigating factors; 3) review medical treatment and testing conducted by the DoS Bureau of Medical Services, UM, and Penn; 4) characterize the illness; and 5) develop and disseminate appropriate communications regarding the unexplained phenomenon. After initial review of the available data, CDC developed three objectives 1) systematically analyze all medical records from available sources, 2) establish an epidemiological case definition for the investigation, and 3) describe the pattern and timing of symptoms relative to time in Cuba.

## SALIENT FINDINGS (*BY OBJECTIVE*)

### Review of Data from Available Sources

The DoS developed the Havana Acquired Brain Injury Tool (HABIT) to screen USG employees and EFMs already stationed in Havana, Cuba who self-reported symptoms and persons deploying to Havana, Cuba. As of March 6, 2019, DoS provided CDC with information for 68 persons visiting or stationed in Cuba. Information included pre-deployment HABIT results and medical evacuation assessments (including HABIT results) performed by DoS staff of persons reporting symptoms; 15 persons had only pre-deployment information. Not all persons who self-reported symptoms underwent evaluation with the HABIT. Persons who reported symptoms could seek care as necessary at UM, Penn, or both. In late 2018, NIH began offering persons who self-reported symptoms enrollment in a clinical research study that would systematically record information regarding their medical status.

The CDC team reviewed medical records for 95 persons who underwent evaluation, care, or treatment at one or more of four locations: DoS, Penn, UM, or NIH. A total of 158 records were available from 95 persons for review. Figure 1 details the number of persons from each data source.

(b)(6)

The CDC team abstracted and reviewed information from the medical records and summarized findings on history of illness, relevant past medical history, clinical course, and objective diagnostic testing and assessments. (For a complete review of methods proceed to page 14.) Of note, CDC did not conduct any evaluations and relied on what was documented in medical records provided by DoS, Penn, UM, and NIH.

Overall, 62% (n=59) of evaluated persons had at least one symptom documented with no information regarding timing of onset, 53% (n=31) of whom had no description of onset — only a list of symptoms at clinical evaluation. Additionally, 33% (n=31) of evaluated persons had no abnormal objective findings recorded on physical examination, diagnostic testing, or clinical assessments. Dates of arrival to or departure from Cuba were missing for 47% (n=45) and 51% (n=48) of persons, respectively. Also missing were key demographics such as date of birth for 34% (n=33) and sex for 40% (n=38).

The medical team from UM began assessing persons in May 2017.[iii] Medical records received from UM contain descriptions of disease onset but did not consistently document all reported symptoms or abnormalities found during the physical exam, imaging, or other diagnostic screenings and assessments. For the six persons with only an UM chart, three contained no in-depth information on diagnostic testing or health assessments and the remaining four were missing information regarding symptom onset.

The Penn medical team began evaluating persons in August 2017 with an average of 203 days between assessment and perceived exposure.[i] The main symptoms reported were vestibular deficits, oculomotor deficits, headaches, anxiety, sleep impairment, tinnitus, ear pain, or cognitive deficits after arriving in Havana, Cuba.[j] While the Penn process for initial intake evolved over time, the team consistently captured presence or absence of symptoms and referred persons with symptoms for further testing and evaluation. Data were not standardized or consistent for all evaluated medical records as the primary documentation objective was for individual clinical evaluation and not a planned, prospective epidemiology study. However, all persons evaluated by Penn had at least one objective finding on the physical exam, diagnostic testing, or clinical assessment. Only 21% (n=11) of persons evaluated at Penn had a recorded onset date for all reported symptoms and 75% (n=71) of persons overall (evaluated anywhere) had at least one symptom identified upon clinical evaluation without a recorded onset date.

The seven medical records received from NIH were thorough, but on average persons seen at NIH arrived 618 days after initial symptom onset.

DoS records contained mainly information from the HABIT, a tool used for screening, and did not include information about timing of symptom onset. Several persons seen only at DoS had no documented symptoms while in Cuba or shortly after leaving Cuba, because if the HABIT identified symptoms, persons were referred for follow up at Miami or Penn.

**Commonly Reported Symptoms:** The 95 persons whose symptoms were reviewed for inclusion or exclusion as a case (Figure 1) reported multiple and varying symptoms including head pressure, disorientation, nausea, headache, vestibular disturbances (dizziness, vertigo, falling over easily, balance issues, difficulty walking), auditory symptoms (tinnitus, ear pain, ear pressure, sudden hearing loss), vision changes (decreased or blurry vision, double vision, eye pain, other vision change), and cognitive deficits (cognitive dysfunction, memory problems, difficulty finding words, difficulty reading, difficulty with basic math). When records contained onset dates, the most commonly reported initial symptoms were auditory symptoms, headache, and nausea. The most common symptoms of subsequent onset were vestibular disturbances and cognitive deficits (Table 1).

**Table 1. Reported qualifying symptom onset for all persons evaluated (n = 95)**

| *Symptom reported* | ***Persons with initial onset*** | ***Persons with subsequent onset*** | ***Total persons reporting symptom (including unknown onset)*** |
|---|---|---|---|
| ***Disorientation*** | 5 | 1 | 6 |
| ***Head Pressure*** | 5 | 2 | 11 |
| ***Headache*** | 12 | 7 | 35 |
| ***Nausea*** | 10 | 5 | 20 |
| ***Auditory symptoms**** | 13 | 9 | 32 |
| ***Cognitive deficits**** | 4 | 16 | 37 |

| | | | |
|---|---|---|---|
| ***Vestibular disturbances**** | 8 | 20 | 38 |
| ***Vision changes**** | 1 | 8 | 24 |
| *Includes multiple symptoms, persons could report different onsets for each symptom | | | |

## Case Definition

Based on the information abstracted from DoS, UM, Penn, and NIH records, and impressions gathered from the treating physicians CDC developed and applied the following stratified case definitions to all 95 evaluated persons.

<u>Presumptive</u>: Biphasic symptom onset with initial symptom onset while in Cuba or within two weeks of returning from Cuba including

- An initial phase that included at least one of the following symptoms with no alternative explanation
  - Head pressure
  - Disorientation
  - Nausea
  - Headache
  - Vestibular disturbances
  - Auditory symptoms
  - Vision changes
- AND, a secondary phase of symptoms that included at least one of the following symptoms with no alternative explanation
  - Vestibular disturbances
  - Cognitive deficits

<u>Possible</u>:

A possible case was defined as onset of symptoms listed in Table 1 while in Cuba or within two weeks of returning from Cuba with a biphasic onset of symptoms that did not include vestibular disturbances or cognitive deficits in the secondary phase. A possible case was also defined as a pattern of vestibular disturbances or cognitive deficits with unknown onset pattern and at least one of the following symptoms with no alternative explanation:

- Head pressure
- Disorientation
- Auditory symptoms
- Vision changes

Figure 2 depicts the process for applying the case definition to the 95 person's medical records reviewed and abstracted by the CDC team. Overall, the process classified 15 presumptive, 31 possible, and 49 not likely cases.

The 15 presumptive cases had recorded information about onset and reported symptoms that allowed for identification of a biphasic onset that included secondary onset of either cognitive deficit(s) or vestibular disturbance(s).

Among the 31 possible cases

- 4 persons reported a biphasic onset of symptoms listed in Table 1but no cognitive deficit or vestibular disturbance
- 27 persons reported cognitive deficit(s) or vestibular disturbance(s) but lacked enough information to identify a biphasic onset of symptoms
-

Of the 49 not likely cases

- 22 persons did not meet the case definition because they lacked a recorded qualifying symptom with onset while in Cuba or within two weeks of returning from Cuba
- 8 persons had a medical history or plausible alternative explanation for all of their reported symptoms
- 15 persons only reported one symptom that was not explained by their medical history or another more plausible diagnosis or did not have a biphasic clinical course
- 4 persons had no reported time frame for onset and did not report cognitive deficit or vestibular disturbance as a symptom

**Figure 2. Case Classification Process:**




* For these analyses, "symptoms" include headache, head pressure, disorientation, nausea, vestibular disturbances, auditory symptoms, vision changes, or cognitive deficits.

(b)(6)

Persons with symptomatology classified as presumptive cases were most likely to report an initial onset of nausea or auditory symptoms than other symptoms (Table 2).

**Table 2. Documented qualifying symptom onset** for presumptive cases (n=15)**

| *Symptom Documented* | ***Initial onset*** | ***Subsequent onset*** | ***Total reporting each symptom (includes unknown onset)*** |
|---|---|---|---|
| ***Disorientation*** | 5 | 1 | 5 |
| ***Head Pressure*** | 4 | 2 | 6 |
| ***Headache*** | 8 | 6 | 10 |
| ***Nausea*** | 8 | 4 | 12 |
| ***Auditory symptoms**** | 8 | 4 | 10 |
| ***Cognitive deficits**** | 3 | 13 | 13 |
| ***Vestibular disturbances**** | 6 | 13 | 14 |
| ***Vision changes**** | 1 | 6 | 11 |

*Includes multiple symptoms, some persons reported different onsets for each symptom
**Not all symptoms had a known onset, but persons were classified as having presumptive cases if they had at least two qualifying symptoms with onset dates.

## Describe the pattern and timing of symptoms relative to time in Cuba

**Descriptive Epidemiology:** Due to a high proportion of missing demographic data in the medical records received by CDC, reliable statistical tests for significant differences between demographic groups could not be performed (Table 3). However, it appears that in general, presumptive, possible, and not likely cases were in persons of similar gender and duty type (Temporary Duty [TDY] versus Permanent Change of Station [PCS]) to persons considered to be possible or not likely cases (Table 3). The exclusion of persons with plausible explanations for any symptom could be responsible for the apparent age difference between persons classified as presumptive and possible cases as the prevalence of medical comorbidities that could explain otherwise qualifying symptoms increases with age. Persons with symptomatology classified as presumptive cases in general were in Havana, Cuba for a shorter duration of time and reported a greater overall number of symptoms compared to persons with symptomatology classified as possible and not likely cases (Table 3). Ten of the 15 persons with symptomatology classified as presumptive cases (67%) reported at least one unexplained auditory or sensory event.

**Table 3. Demographic characteristics by case status**

| | | *Presumptive (n = 15)* | *Possible (n = 31)* | *Not Likely (n = 49)* | *Overall (n = 95)* |
|---|---|---|---|---|---|
| ***Age (years)*** | ***Median:*** | 38 | 46 | 37 | 39 |
| | ***Range:*** | 24–65 | 27–60 | 8–56 | 8–65 |
| | ***Missing n (%)*** | 0 (0%) | 10 (33%) | 28 (57%) | 38 (40%) |
| ***Gender (% male)*** | | 60% | 50% | 62% | 57% |
| | ***Missing n (%)*** | 0 (0%) | 8 (25%) | 21 (42%) | 29 (30%) |
| ***Time in Country (months)*** | ***Median:*** | 3 | 15 | 9 | 9 |
| | ***Range:*** | 0–26 | 0–26 | 0–28 | 0–28 |
| | ***Missing n (%)*** | 4 (36%) | 16 (52%) | 32 (65%) | 52 (55%) |
| ***TDY vs PCS (% PCS)*** | | 67% | 79% | 61% | 69% |
| | ***Missing n (%)*** | 0 (0%) | 12 (39%) | 31 (63%) | 43 (45%) |
| ***Number of Documented Symptoms*** | | | | | |
| | ***Median:*** | 6 | 3 | 1 | 3 |
| | ***Range:*** | 2–8 | 2–8 | 1-4 | 0-8 |

TDY (Temporary Duty), PCS (Permanent Change of Station)

For 55% of the persons evaluated, some symptoms lacked a corresponding onset date. For those who did have documented onset date, onset ranged from May 2016 to May 2018 (Figure 3).

(b)(6)

**Clinical examination, imaging, and testing results among presumptive cases:** Clinically relevant examinations, diagnostic imaging, and specialist assessments conducted by health care providers for the 15 persons with symptomatology classified as presumptive cases were reviewed. Despite the variability in the examinations and testing performed by clinicians from various medical specialties at several medical

centers, most patients have a complete neurological exam, magnetic resonance imaging (MRI), and neurocognitive testing completed. Table 4 describes the findings from examinations, imaging studies, and other assessments conducted among those whose symptomatology met the presumptive case definition criteria.

(b)(6)

(b)(6)

## LIMITATIONS

Medical records reviewed for 95 persons varied in completeness with some medical records having in-depth evaluation notes and results while other sources had a relative paucity of relevant data. Furthermore, lack of common data fields across sources, missing variables, and incomplete data limited the CDC team's ability to classify cases. Finally, in most instances, clinicians did not evaluate affected persons until many months after symptom onset and after media exposure of the events, which could have biased the information collected and recorded, and thus clinical care decisions.

In traditional epidemiologic case finding, sensitivity, specificity, and predictive value depend on the prevalence of disease. In the absence of a definitive test for the condition under investigation, the team elected to prioritize specificity rather than sensitivity. Prioritizing specificity over sensitivity likely excluded persons who may have had similar exposure and outcome conditions resulting in misclassification of cases and non-cases. In general, sensitivity and specificity will depend on the prevalence of mimicking or masking conditions. Often, a more sensitive definition will be less specific and vice-versa. The choice of

where to draw the line between sensitivity and specificity depends on the cost of a false positive versus a false negative in a specific application.

The existing data available from medical records did not allow for thorough examination of risk and mitigating factors because information about potential risk and mitigating factors was limited. In addition, this study does not have a suitable comparison population to assess risk and mitigation factors.

The findings in this report are subject to additional limitations. Clinicians populated information in medical records in the course of clinical care rather than systematically collecting data for an epidemiologic investigation. Many initial patient encounters occurred months after the reports of unexplained illness began and therefore persons might not accurately remember their symptoms and experiences from the past. Moreover, the widespread media coverage of these unexplained events might have influenced symptoms and experiences reported to health care providers. Additionally, information was subject to clinician judgement and varied in the extent of inquiry and recording. The inconsistency in recorded information is not unusual given multiple medical centers and clinicians with various specialties were assessing a variety of persons with various clinical presentations over an extended period. However, this inconsistency hindered CDC's ability to discriminate patterns in the data. The findings and interpretations of this analysis are the product on data available to CDC and could change if new information becomes available.

## Conclusion

This epidemiologic investigation by CDC systematically analyzed clinical data for persons seen at the DoS Bureau of Medical Services, UM, Penn, and NIH for whom CDC received records. The CDC developed the epidemiologic case definition from the existing medical records on 95 persons self-identified as having symptoms or evaluated by DoS prior to deployment. The primary steps of an epidemiologic investigation[iv] are to establish the existence of an outbreak and verify the diagnosis. However, one challenge with this investigation is the lack of a well-defined medical diagnosis and an uncertain source of exposure attributable to the physical symptoms experienced by USG employees and EFMs. The CDC's epidemiologic case definition focused on the pattern and timing of symptom onset relative to time in Cuba.

The evaluations conducted thus far have not identified a mechanism of injury, process of exposure, effective treatment, or mitigating factor for the unexplained cluster of symptoms experienced by those stationed in Havana, Cuba.

Despite initially considering a retrospective case-control study to assess risk and mitigating factors, CDC does not recommend this approach because information collected after large gaps of time is subject to several types of bias. Given that interviews with persons with and without symptoms would take place after more time elapsed from the onset of unexplained events and initial symptoms experienced, the data collected would be subject to increasing recall bias, rendering it less likely to be as accurate as information collected immediately after the event. A retrospective case-control study is also at risk for selection bias because persons who choose to participate in the case-control study might be meaningfully different from those who do not participate and could lead to a misleading conclusion. Another challenge with a retrospective case-control study includes the potential for misattribution of symptoms to unrelated adverse events.[v] In summary, the above limitations of a retrospective case-control study in this situation, especially the time delay between onset of symptoms and data collection, could generate misleading or obscured findings.

Given the aforementioned limitations of a retrospective case-control study, CDC recommends a prospective case-control investigation should new cases arise. CDC is preparing for an investigation in conjunction with the DoS. This approach would reduce the likelihood of the biases and limitations listed previously in a future investigation. CDC is working with partners to disseminate findings from this investigation to the medical community and the public.

## METHODS

CDC treated the request by DoS as a public health response and convened a CDC team of subject matter experts in epidemiology, neurology, toxicology, occupational health, infectious diseases, behavioral health, and radiation health.

The DoS developed a screening tool (HABIT) based on the initially reported symptoms. The screening tool collected current symptoms and used a neurocognitive assessment to assess immediate memory and concentration and the balanced error scoring system (BESS) or modified BESS (mBESS) to assess vestibular disturbance. UM or Penn received USG employees and EFMs requiring further evaluation for treatment.

**Data Collection and Abstraction:** CDC received data from four sources

- DoS screening evaluations of USG employees and EFMs from February 2017 through May 2018
- UM medical records for evaluations and testing performed at UM from May 2017 through July 2017
- Penn medical records for evaluations and testing performed at Penn or by collaborating therapists from August 2017 through August 2018
- NIH medical records for evaluations and testing performed at NIH from June through December 2018

CDC received access to the Penn and UM charts in August 2018 and began receiving unredacted DoS medical records for Cuba-related patients in November 2018.

The medical records from Penn were reviewed and abstracted between September and December 2018, and information available in the electronic medical record system (EPIC) on the date of review was included. Instead of access to an electronic medical record system, the other sources provided copies of medical records to CDC. Medical records from UM were reviewed and abstracted in October 2018. All available information in unredacted DoS medical records provided by November 2018 were included in the review. NIH began systematically evaluating patients in June 2018 and provided a copy of the medical records to CDC in December 2018. NIH records were reviewed and abstracted in January 2019.

Based on the DoS screening tool and reports published by UM, the team developed an abstraction tool to abstract relevant clinical information from the available data sources. To direct the secondary analysis of the available data, the CDC team started with an initial review of 52 available Penn medical records. The review systematically collected reported symptoms, completed clinical tests, prescribed therapies, and overall provider interpretation of progress. The team conducted a case series analysis to direct updates to the abstraction tool in October 2018.

The updated abstraction tool was used to systematically collect information from DoS and UM and update the information collected from Penn. The final abstraction tool included:

- Demographic information such as age, sex, governmental department, employer deployment type, and date of arrival and departure from Havana, Cuba
- Description of any documented auditory or sensory events
- History of the current illness, including documented symptoms and date and order of onset
- Relevant past medical history
- Clinical course of illness, including recommended therapies and their impact on documented symptoms
- Objective findings on physical examination, diagnostic testing, and clinical assessments
- Assessment of anxiety, stress, and sleep disturbance before and after initial onset of illness

**Case Definition Development:**

Information from DoS, UM, or Penn available to the CDC team were abstracted for each person. CDC used the abstracted data to create an epidemic curve of first symptom onset and frequency table of documented symptoms. CDC considered frequency of documented symptoms, team interpretation of the case series analysis, and clinical impressions from DoS, UM, and Penn to create a working case definition focused on three factors:

1. After discussions with the medical teams at DoS, UM, and Penn, the CDC team concluded that the symptom-inducing event or stimulus occurred while persons were in Cuba. The team only evaluated symptoms that occurred while in Cuba or within two weeks of leaving Cuba. This decision was to increase specificity and exclude symptoms most likely unrelated to the syndrome under investigation based on clinical knowledge of the hypothesized causes set forth by the medical teams.
2. Upon reviewing the records, reported symptoms appeared to evolve over time and often included the emergence of new symptoms while some presenting symptoms resolved. This suggested a biphasic (appearance of one set of symptom(s) followed by another set of symptom(s) days to weeks later) clinical course as opposed to a progressive, relapsing/remitting, or monophasic illness.
3. CDC individually evaluated each symptom based on the clinical interpretation of the medical teams. CDC excluded a symptom from analysis if it identified a pre-existing condition or more plausible alternative diagnosis. CDC implemented this criterion to reduce the likelihood of classifying persons without the condition under investigation as presumptive cases.

For this investigation of case characteristics and potential exposure factors, specificity was deemed more important than sensitivity to prevent dilution of case findings by including non-cases. Missing relevant data, such as accurate onset date, impacted the ability to correctly assign case status to some persons. As a result, CDC might have excluded persons who experienced the condition under investigation as cases in this analysis. CDC does not intend the epidemiologic case definition to influence clinical decisions regarding treatment or compensation.

*Criteria for case inclusion*

- Initial symptom onset occurring while in Cuba or within two weeks of returning from Cuba

- Presence of at least two symptoms including headache, head pressure, disorientation, nausea, vestibular disturbance(s), auditory symptoms, vision changes, and cognitive deficit(s). At least one symptom must be vestibular disturbance, auditory symptoms, vision changes, or cognitive deficit(s).
- The symptoms had to occur without a recorded alternative diagnosis (including pre-existing conditions or new diagnosis) or explanation based on available medical records
- A biphasic symptom onset that included the subsequent onset of vestibular disturbance or cognitive deficit

Not all persons evaluated reported an auditory or sensory event prior to their onset of symptoms, nor did reports of auditory or sensory events consistently correspond temporally with symptom onset. The case definition did not require a documented auditory or sensory event, which will allow for examining any possible correlation between auditory or sensory phenomena and the unexplained symptoms under investigation.

**Data Analysis:** The analysis included general summary statistics for age, gender, time in country, number of documented symptoms, and temporary versus permanent placement in country for all persons with data available to CDC. The number of persons reporting onset of initial symptom(s) by month of first documented symptom was also calculated. The analysis also included the proportion of persons reporting each symptom by case status (i.e., presumptive, possible, and not likely).

---

## REFERENCES

[i] Swanson RL, Hampton S, Green-Mckenzie J, et al. Neurological Manifestations Among US Government Personnel Reporting Directional Audible and Sensory Phenomena in Havana, Cuba. Journal of the American Medical Association. 2018;319(11): 1125-1133. doi:10.1001/jama.2018.1742. https://www.ncbi.nlm.nih.gov/pubmed/29450484

[ii] Reported Injuries to U.S. Personnel in Cuba: State Should Revise Policies to Ensure Appropriate Internal Communication of Relevant Incidents. U.S. Government Accountability Office (U.S. GAO). https://www.gao.gov/products/GAO-18-615. Published.

[iii] Hoffer ME, Levin BE, Snapp H, Buskirk J, Balaban C. Acute findings in an acquired neurosensory dysfunction. Laryngoscope Investigative Otolaryngology. 2018 Dec 12;4(1):124-131. doi:10.1002/lio2.231. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6383299/

[iv] Lesson 6: Investigating an Outbreak. (2016, September 15). Retrieved from https://www.cdc.gov/ophss/csels/dsepd/ss1978/lesson6/section2.html

[v] Silverberg, N D, Iverson, G L, Brubacher, J R, Holland, E, Hoshino, L C, Aquino, A, & Lange, RT (2016). The Nature and Clinical Significance of Preinjury Recall Bias Following Mild Traumatic Brain Injury. Journal of Head Trauma Rehabilitation,31(6), 388-396. doi:10.1097/htr.0000000000000198 https://www.ncbi.nlm.nih.gov/pubmed/26580693

# EXHIBIT B

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30333

March 3, 2025

Leonid Ber
MuckRock News DEPT MR 175938
263 Huntington Ave
Boston, MA 02115
Via email: 175938-80458607@requests.muckrock.com

Dear Mr. Ber:

This letter is our final response regarding your Centers for Disease Control and Prevention and Agency for Toxic Substances and Disease Registry (CDC/ATSDR) Freedom of Information Act (FOIA) request of November 6, 2024, assigned #25-00184-FOIA, for:

> *Any and all document, list, registry, memoranda related to tracking, investigating, and analyzing AHI (Anomalous Health Incidents) and "Havana Syndrome" among the US population.*
>
> *It is public knowledge that AHI and Havana Syndrome are tracked in the AHI Registry, but it is limited to federal employees and their dependents only: https://www.gao.gov/products/gao-24-106593*
>
> *The purpose of this FOIA request is to access any and all documents, lists, registry, memoranda dated January 1, 2018 to November 1, 2024 produced by and circulated within CDC related to tracking , investigating, and analyzing AHI and Havana Syndrome in both federal employees and their dependents, and in civilian adults and children.*

We received your modified scope dated February 18, 2025, which you narrowed the scope as follows:

1. *Pursuant to the Freedom of Information Act, I hereby request the following records: Any and all document, list, registry, memoranda related to tracking, investigating, and analyzing AHI (Anomalous Health Incidents) and 'Havana Syndrome' among the US population, which involves the United States (U.S.) residents with domestic incidents on U.S. soil.*

2. *The purpose of this FOIA request is to access any and all CDC documents, lists, registry, memoranda dated January 1, 2018 to November 1, 2024 produced by and circulated within CDC related to tracking, investigating, and analyzing AHI and Havana Syndrome among the US population, which involves the United States (U.S.) residents with domestic incidents on U.S. soil.*

   *You suggested that the "incidents" listed above may be listed as non-kinetic directed electromagnetic pulse energy weapon.*

The Office of Safety, Security, and Asset Management (OSSAM) located nine pages of responsive records (Eight pages released in part; one page withheld in full).

After a careful review of these pages, some information was withheld from release pursuant to 5 U.S.C. §552 Exemptions 5 and 6. The foreseeable harm standard was considered when applying these redactions.

Exemption 5 protects inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. Exemption 5 therefore incorporates the privileges that protect materials from discovery in litigation, including the deliberative process, attorney work-product, and attorney-client privileges. Information withheld under this exemption was protected under the deliberative process privilege. The deliberative process privilege protects the decision-making process of government agencies. The deliberative process privilege protects materials that are both predecisional and deliberative. The materials that have been withheld under the deliberative process privilege of Exemption 5 are both predecisional and deliberative, and do not contain or represent formal or informal agency policies or decisions. Examples of information withheld include a draft AHI guidance document.

Exemption 6 protects information in personnel and medical files and similar files when disclosure would constitute a clearly unwarranted invasion of personal privacy. The information that has been withheld under Exemption 6 consists of personal information, such as staff email addresses. We have determined that the individuals to whom this information pertains has a substantial privacy interest in withholding it.

Additionally, the Office of Readiness and Response (ORR) search failed to reveal any documents pertaining to your request. Specifically, the ORR searched using the above information but found no records. OFF advised that the CDC has not developed a registry for AHI. The registry referenced in this request is maintained by Department of Defense (DOD). You may wish to reach out to the DoD at the following weblinks:

https://www.foia.gov/agency-search.html?id=35f2f6b9-28a6-448e-b61a-806d2bb3b3af&type=agency and/or
https://www.foia.gov/agency-search.html?id=a777d907-fa12-42d3-869d-586db19ec290&type=component

You may contact our FOIA Public Liaison at 770-488-6246 for any further assistance and to discuss any aspect of your request. Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with the response to this request, you may administratively appeal to the Deputy Agency Chief FOIA Officer, Office of the Assistant Secretary for Public Affairs, U.S. Department of Health and Human Services, via the online portal at https://requests.publiclink.hhs.gov/App/Index.aspx. Your appeal must be electronically transmitted by Monday, June 2, 2025.

Sincerely,



Roger Andoh
CDC/ATSDR FOIA Officer
Office of the Chief Operating Officer
Phone: (770) 488-6399
Fax: (404) 235-1852
Email: foiarequests@cdc.gov

25-00184-FOIA

Outlook

## Accepted: AHI pre-brief with HHS ONS & OASH

| | |
|---|---|
| **Organizer** | Bornstein, Josh (CDC/OCOO/OSSAM/OD) <dsx2@cdc.gov> |
| **Meeting time** | This event occurred 1 year ago (Wed 2/1/2023 11:00 AM - 12:00 PM) |
| **Location** | SCIF; (CDC to link with HHS) |
| **My response** | Accepted |
| **Required attendees** | Bornstein, Josh (CDC/OCOO/OSSAM/OD), Houry, Debra E. (CDC/DDNID/NCIPC/OD), Iademarco, Michael (HHS/OASH), Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO), [redacted] (CDC/OCOO/OSSAM/PHIO), Linden, Gregory (CDC/OCOO/OSSAM) (pbx7@cdc.gov), Vagi, Sara J. (CDC/DDPHSIS/CPR/DEO) |
| **Optional attendees** | CDC CSO (CDC), Trapp, Jonathan (CDC/OCOO/OSSAM), Fussell, Timothy J. (CDC/OCOO/OSSAM/PHIO) |
| **Message sent** | Fri 1/6/2023 5:15 PM |

Outlook

## AHI

**From** Bornstein, Josh (CDC/OCOO/OSSAM/OD) <dsx2@cdc.gov>
**Date** Tue 8/23/2022 4:47 PM
**To** Bertulfo, Joseph (CDC/OCOO/OSSAM/OHSO) <bwn8@cdc.gov>
**Cc** Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO) <tdv0@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] Linden, Gregory (CDC/OCOO/OSSAM/OD) <pbx7@cdc.gov>; Prigodich, Cheryl (CDC/OCOO/OSSAM/OD) <iqz8@cdc.gov>

1 attachment (130 KB)
CDC-AHI Message 6-4-21^jb.docx;

Joe,

As acting OHC director, this is something you should know about. Anomalous Health Incidents (AHI – also referred to as Havana Syndrome) have been reported in USG employees working overseas and stateside. No CDC has reported a case to OHC. However, if one is reported, you should notify Demetri, [redacted] and me ASAP since there are national security reporting protocols that are required. You can call me if it happens and I will walk you through next steps.

The attached describes symptoms and is what went to all OCONUS staff last summer.

Please remind providers about this reporting requirement (they report to you, you let us know).

Thanks,
Josh

Read more:
[Federal Register :: Implementation of HAVANA Act of 2021]

['Havana Syndrome' symptoms in small group most likely caused by directed energy, says U.S. intel panel of experts (nbcnews.com)]

Restricted Use/All CDC Staff

Outlook

## DNI's AHI assessment on this side of the house

**From** [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]
**Date** Fri 3/10/2023 11:37 AM
**To** PHMIT (CDC) <phmit@cdc.gov>; CDC OD OCOO OSSAM phio GST <ODOCOOOSSAMphioGST@cdc.onmicrosoft.com>; Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO) <tdv0@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]

[redacted]

Outlook

## Fwd: A Message from NSC on Anomalous Health Incidents

**From** [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]
**Date** Fri 3/25/2022 5:23 PM
**To** [redacted] (CDC/OCOO/OSSAM/PHIO) <[redacted]> [redacted] (CDC/OCOO/OSSAM/PHIO)
[redacted]

The AHI message was launched to CGH staff.

---

**From:** Pestorius, Ted (CDC/DDPHSIS/CGH/OD) <fpp0@cdc.gov>
**Sent:** Friday, March 25, 2022 5:20:36 PM
**To:** CDC CGH OD Overseas Country Deputy Directors <CDCCGHOverseasDeputyChiefofParty@cdc.gov>; CDC CGH Overseas Country Directors <CDCCGHOverseasChiefofParty@cdc.gov>
**Cc:** Chao, Viviane (CDC/DDPHSIS/CGH/OD) <yuj2@cdc.gov>; Chong, Patrick (CDC/DDPHSIS/CGH/OD) <pec8@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) <[redacted]>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] Pumphrey, Heather (CDC/DDPHSIS/CGH/DGHT) <hbp7@cdc.gov>; Kay, Kelly L. (CDC/DDPHSIS/CGH/DGHP) <klr4@cdc.gov>; Swezy, Virginia (CDC/DDPHSIS/CGH/GID) <vcs3@cdc.gov>; Young, Joni (CDC/DDPHSIS/CGH/DPDM) <gzc8@cdc.gov>
**Subject:** A Message from NSC on Anomalous Health Incidents

All- please share this with all CDC USDH staff in your country. Thanks, Ted

# CDC Anomalous Health Incidents (AHI) Guidance

The U.S. Government is pursuing a rigorous and sustained government-wide response to anomalous health incidents (AHI) and remains committed to providing access to care for affected personnel.
The health and the welfare of all members of our workforce and their dependents are paramount. As we learn more, we want to make sure the workforce has up-to-date information, including guidance on how to respond if you are concerned that you or a dependent have experienced an incident and how to access medical care.

Workforce reporting remains critical to the U.S. Government's ongoing efforts to examine and understand the causes of reported incidents and provide access to care for those who need it. Experiences and symptoms individuals have reported are real, and we are committed to ensuring that all personnel can report suspected incidents without stigma, even if reported incidents may ultimately be due to alternative causes.

If you suspect that you are experiencing sensations associated with an AHI:

- Current response protocols recommend leaving the immediate location as quickly as you are safely able to do so, and noting whether the sensations abate when you do so

- Most importantly, if you are experiencing acute medical symptoms, you should immediately seek medical care. (Individuals affected by a possible AHI typically report a sensory event, such as sound and/or pressure, concurrent with the rapid onset of physical symptoms, to include ear pain or pressure, nausea, disequilibrium, and/or executive dysfunction for which there is no readily apparent explanation)

- Promptly get to a secure government facility—your field site, the Embassy, etc—and follow Embassy protocols for reporting the AHI to Embassy or post health unit

- Also complete the CDC/ATSDR Incident Report and notify OSSAM's Occupational Health Clinics | OSSAM (cdc.gov) directly at 001-404-639-3385.

We want to emphasize that these events are rare. While the symptoms are not unique to AHI, it is important that if you experience an unusual sensation as described above, followed by one or more of the symptoms, it is better to err on the side of caution and report it.

Your health and safety are our top priority. CDC is committed to the safety and well-being of all of our personnel and is working in close partnership with the President's AHI Interagency Coordinator and the broader government-wide effort to ensure the full resources of the U.S. Government are brought to bear to get to the bottom of these incidents and ensure access to needed care.

Ted Pestorius, MPA
Deputy Director
Management and Overseas Operations
Center for Global Health/CDC

404-579-1250



# CDC Anomalous Health Incidents (AHI) Guidance



PRE-DECISIONAL/DELIBERATIVE

OSSAM Office of Safety, Security, and Asset Management

(b)(4)

[redacted]

**PRE-DECISIONAL/DELIBERATIVE**

(b)(5)

[redacted]

**Office of Safety, Security, and Asset Management (OSSAM)**
OSSAM@cdc.gov
http://intranet.cdc.gov/ossam

**Services. Support. Solutions.**

OSSAM Office of Safety, Security, and Asset Management

(b)(6)

[redacted]

# EXHIBIT C

# Collecting Information on Diagnosed Cases of “Havana Syndrome” and its Anomalous Health Incidents (AHI) among Civilians Occurring on US Soil

Interim Report by Len Ber, MD, Global Medical Leader and Board Member for Targeted Justice, Inc., a nonprofit 501(c)(3) organization.

January 2025

**LIST OF ABBREVIATIONS**

| | |
|---|---|
| AHI | Anomalous Health Incidents |
| CDC | Center for Disease Control |
| CNS | Central Nervous System |
| CRHS | Civilian Registry for diagnosed Havana Syndrome and its AHI |
| DHA | Defense Health Agency |
| DOD | Department of Defense |
| EM Energy | Electromagnetic Energy |
| GAO | Government Accountability Office |
| HAVANA Act | Helping American Victims Afflicted by Neurological Attacks Act of 2021 |
| HS | Havana Syndrome |
| IC | Intelligence Community |
| MHS | Military Health System |
| mTBI | Mild Traumatic Brain Injury |
| NAS | National Academy of Sciences |
| NIH | National Institute of Health |
| NKBI | Non-Kinetic Brain Injury |
| US | United States |

**This report is prepared by Targeted Justice, Inc., a nonprofit 501(c)(3) organization for victims of Pulsed Electromagnetic Weapons, and the world's largest and most visited depository of information on the subject matter, TargetedJustice.com.**

**INTRODUCTION**

The Civilian Registry for diagnosed Havana Syndrome victims (CRHS) was established in August of 2024 for the purpose of facilitating tracking and investigation into the prevalence of HS and its acute episodes known as AHI on US soil. The need for creating this registry was prompted by the lack of effort on the side of the US government and US health agencies to monitor and investigate this condition among the general public.

In July of 2024, the US GAO issued a report, "Havana Syndrome: Better Patient Communication and Monitoring of Key DOD Tasks Needed to Better Ensure Timely Treatment" (GAO-24-106593).[1] In this report, GAO reviewed the DOD's efforts to facilitate AHI patients' access to the MHS and develop an AHI Registry:

> Of 334 AHI patients who had qualified for care in the MHS in January 2024, only 33 had been entered in the AHI Registry as of May 2024.

The scope of the GOA report and the DOD's AHI Registry is limited to US government employees and their family members, including children.

> Department of Defense officials estimated that about 15 children had received Secretarial Designation for AHIs as of December 2023.

The report discovered multiple deficiencies in the way DOD manages AHI patients and their accessibility to care, and makes several recommendations to the Director of DHA regarding issuing diagnostic guidance, communicating and implementing care for AHI patients, and developing a plan to gather AHI Trauma Registry consent from individuals who have finished their care in the MHS. No recommendations are made regarding civilian AHI or AHI Trauma patients.

The report makes a distinction between AHI and AHI Trauma because the latter would make patients eligible for a one-time compensation under the HAVANA Act of 2021, and its amended implementation. The final interim rule that went into effect in May 2024 makes DOD employees and their dependents with "qualified injury" eligible for compensation under the Act.

The report suggests that the mechanism behind AHI is unknown:

> "…the precise nature and causes of AHIs remain under investigation…"
>
> "…AHI is a new, unknown condition…"
>
> "…DOD is offering treatment for a poorly understood condition with unknown causes…"

The report also suggests using HS and AHI interchangeably.

> "These events, first labeled 'Havana Syndrome,' are now referred to as AHIs…"

It is our understanding, which coincides with the sentiment expressed in the scientific literature, that the episodes are better described as "Anomalous Health Incidents ***of*** the Havana Syndrome" (emphasis ours)(Giordano, 2022).[2] Despite the narrative that this is a condition with unknown etiology, there are two Scientific Consensus Reports that converge on the prevailing hypothesis that these incidents are caused by exposure to "directed pulsed RF Energy in the MW range" (NAS Consensus Report, 2020),[3] (IC Expert Panel Assessment Report, 2022).[4]

> Four "core characteristics"…of AHIs: (1) the acute onset of audio-vestibular sensory phenomena, including sound and/or pressure, sometimes in only one ear or on one side of the head; (2) other nearly simultaneous signs and symptoms such as vertigo, loss of balance, and ear pain; (3) a strong sense of locality or directionality; and (4) the absence of known environmental or medical conditions that could explain the reported signs and symptoms.

The four "core characteristics" are best explained by the phenomenon of coupling brain activity to external EM pulses, also known as brain entrainment, with findings commonly occurring during and post-concussion. However, given the absence of mechanical (kinetic) injury to the brain in AHI, the causative mechanism should be classified as non-kinetic, thus yielding Non-Kinetic Brain Injury, or NKBI (Ber, 2025).[5]

In this sense, the term "Havana Syndrome" means a chronic condition that encompasses multiple AHIs, including ongoing AHIs. It is suggested to be identified as Non-Kinetic Brain Injury, Non-Kinetic Brain Encephalopathy, or as the report suggests, "AHI Trauma." Based on this framework, we chose "Havana Syndrome" or its equivalent diagnosis, rather than AHI only, to be tracked in the Civilian Registry.

## THE NEED FOR A CIVILIAN REGISTRY

There is an urgent need for the US Government to acknowledge, track, and investigate diagnosed cases of "Havana Syndrome" among civilians beyond the DOD Registry, which is limited to federal employees and their families only. Despite the AHIs being painful and debilitating, there is a grave decline in the CNS cognitive function among the victims. Unlike encephalopathy from kinetic trauma, Non-Kinetic Brain Injury appears to be permanent and tends to get worse with time, especially when AHIs are ongoing, as with many domestic cases.

It's a matter of public safety and public health, with children being affected as well as adults. The CDC has neglected to detect, track, investigate, and address these cases. The Civilian Registry is set to correct this critical situation.

To the best of our knowledge, as of January 1, 2024, there are about 30 civilian patients diagnosed by physicians with “Havana Syndrome” (or equivalent). Only seven patients volunteered to submit their information to the Civilian Registry claiming fear of government persecution and retaliation. This must alert lawmakers and US health officials to the gravity of the situation.

An Interim Report by Chairman Rick Crawford of the Subcommittee on the Central Intelligence Agency titled “Investigating the Intelligence Community’s Conclusions on Anomalous Health Incidents: Is the Intelligence Community Hiding the Real Reason for This Phenomenon?“ issued in December of 2024[6] unequivocally points fingers at the IC (specifically the CIA):

> The IC’s inconsistent approach has had detrimental effects on IC personnel, trust in the IC by policymakers, the understanding of the American public, and perceptions of the IC by both foreign allies and adversaries.
>
> The mishandling of the IC’s response to AHIs has hampered the IC’s ability to collect against developing threats, delayed development of potential mitigations, and harmed the credibility the IC has with its workforce.

During the May 2024 Subcommittee on Counterterrorism, Law Enforcement, and Intelligence hearing entitled “Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad,” Representative Daniel Goldman asked the witnesses present at the hearing:

> “Are any of you aware of any reported incidents from the individuals who are not members of the US Government, domestically, I should say?”

Both witnesses (Ret. Col. Gregory Edgreen and Attorney Mark Zaid) were unable to answer this question, claiming that they only work with federal employees. So, the question remained unanswered. It is obvious that this important question should be addressed to the experts and the organization that tracks these validated cases among civilians. We believe that this organization is the nonprofit Targeted Justice, Inc., whose mission is to document and expose the use of EM weapons against the civilian population. Specifically, the Civilian Registry for diagnosed victims of “Havana Syndrome” and its AHIs holds the answers. The Registry is organized and maintained by an MD in his role of Global Medical Leader and Board Member for Targeted Justice.

The IC has been investigating AHI and “Havana Syndrome” since at least 2016, and 9 years later, the American public still doesn’t have the answers while the reports are pouring in that the IC itself is an obstacle in this investigation. It’s time for Congress to look for unconventional suspects and use different methods of investigating this technological atrocity.

Just how debilitating are the AHIs? A quote from an article in a peer-reviewed medical journal provides a first-person perspective[6]:

> To power through the most severe attacks, I would scream in order to "push" against extremely painful sensation of buffeting (vibrational pressure pain). It feels as if your head is being squeezed in a vibrating vise. You can't talk or perform cognitive tasks—if you try, your brain feels scrambled and foggy. You can't walk—if you try, you lose balance.

In a lawsuit filed by Mark Zaid in December of 2024,[8] ongoing AHI attacks are described as below:

> She continues to suffer recurring incidents of pain that last anywhere from 20 minutes to an hour. The pain is so severe that she likens it to the pain of giving birth.

The American public deserves to know that not only federal employees but also regular civilians including children are being remotely and painfully attacked on US soil, and their health and cognition are being intentionally degraded.

**DATA COLLECTION, PRESENTATION, AND ANALYSIS**

Civilians who are diagnosed by licensed physicians with AHI, "Havana Syndrome," or its equivalent (traumatic brain injury or encephalopathy, specifically Non-Kinetic Brain Injury) submitted their data voluntarily to the Civilian Registry, starting in August 2024. Privacy of their sensitive information has been guaranteed, and cannot be shared with a third party without the volunteers' explicit consent.

Among the seven civilian cases listed in the Registry, there are three males, four females, and one child. Average age of adults is 56 years, ranging from 43 to 71.

States of residence and the number of diagnosed cases as follows: AR-1, IL-1, CO-2, NY-1, and RI-1. Diagnoses were made between 2020 and 2024.

Out of seven listees, one has received disability due to the diagnosis of Traumatic/Non-Kinetic Encephalopathy (no history of concussion). The diagnosis of the victim on disability has been verified by two experts in the subject matter, and the case was submitted to the DOD for further investigation—no investigation was conducted.

Five out of seven patients submitted their cases to the FBI for investigation—the agency refused to investigate their cases. All patients contacted their US senators and representatives, to no avail.

## CONCLUSION

“Havana Syndrome,” or Non-Kinetic Brain Injury, or Non-Kinetic Encephalopathy, or AHI Trauma is a growing public health and safety concern flying under the radar of US Government officials, Congress, health agencies, and law enforcement. It remains undetected and undiagnosed, and has not triggered any investigative efforts, research, or the analysis it deserves. There is no relevant information regarding methods of detection, shielding, diagnostic guidance, and management offered to the American public with respect to this urgent health threat.

Besides AHI being extremely debilitating, the long-term consequences of these attacks are even more worrisome and include progressive neuro-cognitive debilitation of the victims’ CNS.

The present report provides a summary of physician-diagnosed cases of “Havana Syndrome” and its AHIs among civilians attacked on US soil who are not federal employees or their dependents. This is the first of its kind effort to fill gaps in our knowledge and decisively answer critical questions raised by the members of the House Subcommittee on Counterterrorism, Law Enforcement, and Intelligence during the May 8, 2024, hearing “Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad”[7]:

> Are there any civilian victims of AHI and the Havana Syndrome who are not federal employees or their dependents?

## RECOMMENDATIONS

This matter is of the utmost urgency. The US Congress must be informed of the content of this report and act immediately.

Initial steps must entail:

1. For the CDC
    a. To inform Health Departments across the country and start tracking “Havana Syndrome” or equivalent diagnoses
    b. To issue diagnostic guidance for practitioners
    c. To educate the public about this condition
    d. To initiate NIH research into this condition in the civilian population
2. For Law Enforcement
    a. To track diagnosed civilian cases
    b. To investigate diagnosed civilian cases
3. For Congress
    a. To establish a direct line of communication with Targeted Justice, Inc., and its experts

b. To create immediately a multidisciplinary "Havana Syndrome" Civilian Emergency Investigative Task Force and report back to Congress within a month!
c. To inform the general public about the efforts Congress is making
d. To develop a comprehensive plan on how to handle this critical health issue, including enacting appropriate laws

**REFERENCES**


1. *Havana Syndrome: Better Patient Communication and Monitoring of Key DOD Tasks Needed to Better Ensure Timely Treatment*, US Government GAO-24-106593, July 29, 2024. https://www.gao.gov/products/gao-24-106593.
2. Giordano, J., DiEuliis, D. (2022). *Anomalous Health Incidents of the Havana Syndrome: Implications and Lessons for Global Biosecurity and Defense*. Academia Letters, Article 5138, https://doi.org/10.20935/AL5138.
3. National Academies of Sciences, Engineering, and Medicine. 2020. *An Assessment of Illness in U.S. Government Employees and Their Families at Overseas Embassies*. Washington, DC: The National Academies Press. https://doi.org/10.17226/25889.
4. IC Experts Panel Assessment, *Anomalous Health Incidents: Analysis of Potential Causal Mechanisms*, September 2022, https://media.salon.com/pdf/22-cv-674%20Final%20Response%20Package.pdf.
5. Ber, L., *Helping Physicians to Understand "Havana Syndrome" and a Novel Method of Managing AHIs*, Advanced Medical Sciences: An International Journal (AMS), Vol. 12, No.1, February 2025, https://doi.org/10.5121/ams.2024.12101.
6. *Investigating the Intelligence Community's Conclusions on Anomalous Health Incidents: Is the Intelligence Community Hiding the Real Reason for This Phenomenon?* Interim Report by Chairman Rick Crawford of the Subcommittee on the Central Intelligence Agency of the House Permanent Select Committee on Intelligence, December 2024. https://intelligence.house.gov/uploadedfiles/unclassified_ahi_report.pdf.
7. A Subcommittee on Counterterrorism, Law Enforcement, and Intelligence hearing entitled *"Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad."* May 8, 2024. https://homeland.house.gov/hearing/silent-weapons-examining-foreign-anomalous-health-incidents-targeting-americans-in-the-homeland/.
8. In US District Court for the District of Columbia, *AFSA v. DOS*, Case 1:24-cv-03385-AHA, Filed December 4, 2024. https://www.pacermonitor.com/public/case/56062763/AMERICAN_FOREIGN_SERVICE_ASSOCIATION,_et_al_v_US_DEPARTMENT_OF_STATE.

# EXHIBIT D

Name: Len Ber | DOB: 8/8/1965 | MRN: E14099486 | PCP: Eric Christoff, MD | Legal Name: Leonid Ber

Howard Brown Health

HBH HALSTED
3501 N HALSTED ST
CHICAGO IL 60657-1832
Phone: 773-388-1600
Fax: 773-296-8401

Date: Aug 28, 2025

To: State Epidemiologist

Illinois Department of Public Health (IDPH)
525-535 West Jefferson Street
Springfield, IL 62761

**Subject: Request for public-health assistance for a civilian patient with diagnosed AHI/ "Havana Syndrome" in Bloomingdale, Illinois**

Dear State Epidemiologist,

I am writing as the treating physician for a civilian patient under my care diagnosed with **Anomalous Health Incidents (AHI)**, commonly referred to as "Havana Syndrome." I am requesting IDPH's assistance with case acknowledgment, surveillance guidance, and coordination of any appropriate environmental/forensic assessment.

**Patient (de-identified) summary**

- **Patient:** Adult, age 60, resident of Bloomingdale, IL (non-federal civilian).
- **Onset:** Acute Onset Incidents started in 2019 and continuing to this date at patient's residence.
- **Symptoms:** Sudden vibrating pressure in the head, tinnitus, dizziness/vertigo, imbalance, cognitive fog, nausea.
- **Exam/Testing to date:** Diagnosed using neurological and vestibular tests by an expert at University of Miami, Dr. Micheal E. Hoffer, confirmed by neuroweapon expert James Giordano, diagnosed with traumatic encephalopathy, two severely abnormal qEEG with swLoreta.
- **Differential considered/excluded:** Stroke, infectious etiologies (including otologic/vestibular), toxic exposures (CO/solvents/metals), concussion, primary migraine disorder, psychiatric causes.
- **Current status:** Persistent vestibular/sensory/auditory/cognitive symptoms impacting function. Vestibular rehabilitation unsuccessful (2 attempts)

**Why I'm contacting IDPH**

Given (1) the acute, unusual symptom constellation; (2) diagnosis made and confirmed by AHI experts, (3) absence of an alternative diagnosis after appropriate workup, and (4) the potential for other unrecognized cases in the community, I believe this presentation warrants public health attention.

"It is now widely accepted that directed energy exposure is the most probable cause" of AHI*. (James Giordano., et al. "Assessing Anomalous Health Incidents of "Havana Syndrome": Potential Utility - and Issues - of Using Modular Integrated Artificial Intelligence". EC Neurology 17.4 (2025): 01-08.)*

**Requests to IDPH**

1. **Case consultation & reporting guidance.** Please advise on the use of an AHI-aligned case definition for civilians in Illinois and the appropriate state reporting pathway.
2. **Syndromic surveillance pilot.** I request that you consider exploring a pilot query within Illinois's participation in CDC's National Syndromic Surveillance Program (NSSP/BioSense) to

flag potential AHI-like emergency-department presentations.

3. **Escalation criteria.** Please advise on thresholds for requesting CDC assistance (e.g., an Epi-Aid) if additional cases are identified or if analytic epidemiology becomes warranted.
4. **Data sharing & privacy.** My patient is willing to provide clinical information directly or he intends to share his medical record in an explicit release to you for this purpose if you request that.

My patient and I appreciate your consideration of this request, and stand ready to collaborate with IDPH on next steps if you agree that this is something appropriate for IDPH to be tracking.

Sincerely,

Eric Christoff MD
3501 N. Halsted St
Chicago IL 60657

Phone (773) 388-1600 | Fax 773 296 8410| Email
ericc@howardbrown.org

MyChart® licensed from Epic Systems Corporation© 1999 - 2025

# EXHIBIT B:

NIH PETITION

**Petition to the National Institutes of Health (NIH)**

Submitted on behalf of Targeted Justice, Inc., a 501(c)(3) non-profit organization

Date: September 29, 2025

To: Dr. Jay Bhattacharya, Director, National Institutes of Health (NIH)

Cc: Dr. Walter J. Koroshetz, Director, National Institute of Neurological Disorders and Stroke (NINDS); NIH Office of Science Policy

Subject: Petition for NIH Action on Civilian “Havana Syndrome”/Anomalous Health Incidents: Recognition, Research Inclusion, and Clinical Protocols

Dear Dr. Bhattacharya:

Targeted Justice, Inc. respectfully submits this formal petition to the National Institutes of Health (NIH) to recognize and respond to diagnosed cases of “Havana Syndrome,” also known as Anomalous Health Incidents (AHIs), among civilian populations. We urge the NIH to take a leadership role in researching this phenomenon as it affects civilians, and to extend the same research programs and clinical interventions available to federal employees to civilian patients. This petition is prompted by growing evidence of civilian cases (summarized below) and is submitted for the public record, to be cited in anticipated litigation on behalf of diagnosed civilian patients. We request that NIH publicly acknowledge receipt of this petition and expeditiously implement the measures detailed herein, in coordination with other agencies as needed.

**Background and Need for NIH Action**

“Havana Syndrome” refers to the constellation of acute neurological symptoms (accompanied by auditory or sensory events) first reported by U.S. diplomats in Cuba in 2016. The government term for these incidents is “Anomalous Health Incidents” (AHIs). Hallmark symptoms include sudden onset of ear pain and/or vibrating pressure (ala buffeting), loud sounds, followed by dizziness, balance problems, cognitive impairment, headaches, and other neurological deficits.

Expert investigations have determined that this combination of symptoms and clinical findings is unique and novel, not attributable to any known neurological or medical condition. The 2020 National Academies of Sciences (NASEM) panel established: “directed, pulsed radiofrequency energy appears to be the most plausible mechanism in explaining these cases, noting the “significant suffering and debility” among victims and emphasizing that known diagnoses could not explain the distinct early symptoms seen in many cases. A September 2022 Intelligence Community Experts Panel echoed the

same mechanism and concluded that the signs and symptoms reported in a core set of AHI cases are genuine and *"cannot be easily explained by known environmental or medical conditions"*, indicating an unprecedented syndrome.

The NIH has already been at the forefront of investigating AHIs among affected U.S. government personnel. In early 2018, the NIH, in consultation with the Department of State and Intelligence Community, launched an intramural research program to study AHIs, including an exploratory natural history study of those affected. NIH created a referral infrastructure and engaged experts across its Institutes to systematically evaluate patients, enrolling *U.S. government employees and their adult family members* who had reported AHI exposures. These participants underwent week-long evaluations at the NIH Clinical Center in Bethesda, MD, with follow-up exams annually. The NIH study rigorously tested hearing, vestibular function, cognition, vision, and biomarkers in 86 AHI patients versus 30 control subjects. The findings (published in *JAMA*, April 2024) indicated no MRI-detectable structural brain injury, but did show significant differences in balance function and increased symptoms of fatigue, PTSD, and depression in the AHI group. Notably, 28% of the AHI patients were diagnosed with functional neurological disorders (e.g. persistent postural-perceptual dizziness, PPPD) resulting from the events.

Despite NIH's efforts, serious ethical breaches have since come to light. In mid-2024, multiple study participants filed complaints that they had not truly consented to join the NIH research. An internal NIH investigation confirmed that some patients were *coerced* into participating. Importantly, this coercion was not by the NIH investigators themselves – rather, participants reported that officials within the CIA pressured or "forced" them to enroll as a *precondition* for receiving medical care at Walter Reed and other military hospital (CNN reports).

As a result of these findings, NIH leadership took the extraordinary step of halting the AHI study in August–September 2024. An NIH spokesperson announced the research was suspended "out of an abundance of caution" once it became clear that participants' consent was compromised. This effectively shut down NIH's AHI research program. We commend NIH for acting decisively to stop unethical research. However, the damage was already done: data had been collected under duress, and two high-profile papers using that data had already been published.

The coercion scandal casts doubt on the validity of the NIH studies' conclusions. If participants were induced by CIA officials to join against their will – and if, as several have alleged, the CIA selectively influenced which patients entered the study – then the sample and data may have been intentionally skewed. For instance, patient advocates suspect that the CIA "watered down" the NIH data set by insisting that individuals with unrelated health issues be included as AHI cases, while excluding some severe cases, thus biasing results toward "no findings". They also allege some participants only agreed to follow CIA direction because their medical care was held hostage. These circumstances undermine confidence in the published outcomes.

Havana Syndrome victims and experts have therefore called on JAMA to retract the two NIH papers derived from this tainted study. They argue that research based on coerced participation and potential sample manipulation should not remain in the scientific literature. As *Fox News* reported (September 2024), patient groups are pressing for retraction of the JAMA articles which had concluded there was "no significant MRI-detectable evidence of brain injury" in AHI patients. At minimum, a prominent *expression of concern* or re-evaluation of the data is warranted. We share this concern. It is telling that even as NIH shut down the study for ethics violations, the agency simultaneously claimed that the study's conclusions were unchanged by those violations. This stance is difficult to reconcile – if coercion invalidated the process, how can we be sure it didn't invalidate the results? The appearance of a conflict of interest (the CIA, an interested party, meddling in a study about an illness afflicting its officers) further erodes trust.

The most recent 2024 Intelligence Community (IC) Report on Anomalous Health Incidents explicitly relied on the NIH's March 2024 JAMA studies to downplay evidence of injury. Under its medical research section, the report states: *"The IC continues to assess that medical research indicates that U.S. personnel and dependents reporting possible AHIs do not have a consistent set of physical injuries, based on research published in 2024 from the National Institutes of Health (NIH) that reaffirms prior medical analysis."* The portion about reaffirming previous medical analysis is simply not true (see below). In effect, the IC is using the NIH publications – which themselves are now clouded by evidence of CIA coercion of study participants and questions about research integrity – as the cornerstone of its conclusion that AHIs lack consistent physical injury markers. This linkage underscores the outsized policy impact of compromised NIH research: its findings are not just academic but have been adopted wholesale by the intelligence community to justify continued skepticism and inaction toward affected civilians. If the NIH studies were ethically compromised or scientifically incomplete, then the IC's 2024 assessment is likewise undermined, magnifying the urgency for NIH to revisit, correct, or retract those studies.

The NIH-led studies were not the first scientific investigations of Havana Syndrome. Earlier research by independent teams found evidence of brain injury – findings now seemingly dismissed by the NIH papers. In 2018–2019, a medical team at the University of Pennsylvania (UPenn) evaluated U.S. diplomats and spies suffering AHI symptoms. Their initial study (published in *JAMA*, 2019) reported significant differences in brain tissue volume, connectivity, and other abnormalities consistent with a "widespread brain injury" in the diplomats when compared to healthy individuals. These included structural and functional MRI changes (especially in the cerebellum and visual/auditory networks) that aligned with the patients' neurological symptoms. In short, the *UPenn team's findings suggested the AHI victims had sustained a concussive-like brain insult.*

However, the follow-up research by the UPenn investigators was never published. According to the recent Senate Select Committee on Intelligence report (unclassified summary dated December 2024), the UPenn team conducted a second, more in-depth study which *did* find brain injury indicators – but that paper remained "unpublished." Committee interviews revealed that *"UPenn officials said they did not try to publish [the*

*follow-up] because a U.S. government researcher had tried to publicly undermine their findings."* In other words, intelligence or government personnel – unhappy with the implications of the early UPenn results – apparently *bullied* the scientists, casting doubt on their data, until the researchers abandoned efforts to formally publish the second study. This is a shocking allegation of interference in the scientific process. It implies that valid findings indicating neurological injury were suppressed, leaving the public record with only the more conservative NIH studies. (Indeed, the Senate report notes that "concerns about the UPenn study" were used to justify launching the NIH's new research, which ultimately contradicted UPenn's results.

Taken together, these developments show a troubling pattern of CIA involvement influencing clinical research outcomes: one study's unfavorable results were undermined and buried, while a later study was managed in a way (through coerced enrollment and possibly control of the sample) to produce null findings. Such actions, if not addressed, not only erode public trust in government research but also do a grave disservice to afflicted individuals seeking answers.

Importantly, all of the published research and clinical efforts have been focused exclusively on government-affiliated individuals. A 2024 GAO Report mentions that 334 people had qualified for AHI-related care in the Military Health System as of January 2024**.** That number explicitly included their family members (dependents**)**, and highlights 15 cases among children. This indicates that the Government Agencies are already aware of civilian victims (albeit dependents of the federal employees) but failed to act. Civilians (who are not dependents of federal employees) with identical diagnoses have been excluded from these programs, despite suffering the same symptoms and health consequences. This petition calls on NIH to close that gap.

We now have confirmed civilian cases of Havana Syndrome: as documented in the attached January 2025 Civilian Havana Syndrome Registry Report (Targeted Justice, Inc.) (**Exhibit A**), at least seven civilians (including a minor) across five U.S. states have received a medical diagnosis consistent with Havana Syndrome/AHI between 2020 and 2024. Most recent data indicate 33 diagnosed civilians and 9 cases confirmed by the Registry maintained by a retired MD. This Registry was created in the absence of the CDC action to recognize, track; and of the NIH to investigate diagnosed civilian cases. Many more civilian cases are suspected – the Registry Report identified 30 likely civilian patients as of early 2025 – but only a fraction have come forward due to fear and the lack of official recognition. Those who have come forward exhibit the same core symptoms and injuries as the federal cases. For instance, one civilian patient in the report is on permanent disability after a diagnosis of "Traumatic Encephalopathy" (a Havana Syndrome-related brain injury) confirmed by experts. All reported civilian victims experienced acute "AHI" events on U.S. soil (not abroad), indicating a domestic public health threat that parallels the overseas incidents.

Despite these findings, civilians have not been offered access to the specialized diagnostic or treatment pathways that the government has established for its employees. There is currently no NIH-sponsored study or clinic to evaluate civilian Havana Syndrome patients, no formal outreach or registry to include them, and no

clinical trials open to them. In effect, civilian victims are left on their own – many struggle to find knowledgeable doctors, and some have resorted to ad-hoc measures or private treatments. This disparity is profoundly unjust and scientifically counterproductive. If a mysterious condition is affecting both federal employees and private citizens, our national research enterprise should be investigating *both populations* to fully understand the phenomenon. Excluding civilians means losing valuable data points and missing potential differences or patterns that could lead to a cause or cure. It also raises ethical concerns of equity: U.S. taxpayers who fall victim to this affliction deserve the same care and attention as government personnel.

The CDC has acknowledged via FOIA that it has no civilian tracking or guidance for this condition, which further highlights the need for NIH to step in on the research and clinical front. In August 2025, a physician's attempt to report a civilian AHI case to state public health authorities (**Exhibit B**) underscores that no formal channels exist to capture or study these civilian cases. As a result, critical clinical data from civilian patients – including possible insights into long-term outcomes or effective interventions – are being lost.

Because Havana Syndrome/AHI is not recognized as a reportable condition, attempts by physicians to notify public health authorities have been thwarted. In one documented case (***Exhibit C***), a physician in August 2025 reported a confirmed civilian AHI case to state health officials – but with no CDC alert or category for "Havana Syndrome," the report could not be properly logged or escalated. This illustrates the broader systemic failure to capture civilian cases in our national health surveillance. In short, civilian patients are falling through the cracks: they have no formal channel to report incidents, no CDC guidance to inform their doctors, and no access to the specialized research and treatment programs that federal employees receive.

The apparent failure of the CDC and NIH to act also resulted in gross violations of patient's rights and allowed government to interfere (the list below is only the top of the iceberg):

1. Patients seeking appointment at the University of Miami Medical Center were turned away because they were not federal employees (2023-2024)

2. A subject matter expert, Dr. Michael Hoffer MD working at the same medical institution admitted to his patient: "*"I hope you didn't come all this way and be disappointed, but I am not allowed to diagnose Havana Syndrome victims any longer. The government won't let me".(2024)*

3. In 2022, another expert, Dr. James Giordano (associated with the Georgetown University in DC at the time) confirmed a civilian diagnosed civilian case of Havana Syndrome and reported it (twice) to the DOD that resulted in zero investigation, - a civilian case that otherwise would be handled by the CDC and the NIH.

NIH's leadership and vast research infrastructure make it the ideal agency to address this gap. The situation mirrors past public health challenges where NIH extended research efforts to the broader public (for example, NIH studies on toxin exposures initially seen in military settings, later expanded to community exposures). Moreover, Congress has shown bipartisan concern regarding anomalous health incidents and would likely support NIH in broadening its scope to civilians. Indeed, the House Intelligence Committee's December 2024 report questioned whether agencies are "hiding the real reason for this phenomenon" and not doing enough to investigate all cases. Bringing civilian cases into the fold can only enhance the integrity and completeness of the research.

In sum, there is an urgent need for NIH to formally recognize that Havana Syndrome/AHIs affect civilians, and to mobilize its research and clinical resources accordingly. Below, we detail the specific actions we request NIH to undertake. These align with recommendations from the Civilian Registry Report (**Exhibit A**) and complement the petitions we are simultaneously submitting to the CDC for public health surveillance.

**Actions Requested of the NIH**

Targeted Justice hereby petitions the NIH to take the following five actions to ensure civilians are included in the national response to Havana Syndrome / AHI:

1. **Formal Recognition of Civilian Havana Syndrome/AHI Cases**: Publicly acknowledge that Havana Syndrome (AHI) is a legitimate medical condition that can and *does* affect civilian individuals, not only federal employees. This formal recognition could take the form of an NIH statement or Director's press release affirming that NIH considers civilian cases within its research scope. Such recognition will encourage affected civilians to come forward and will signal to the medical community that these cases are real and warrant attention. It will also lay the groundwork for including civilians in research protocols.

2. **Inclusion of Civilians in AHI Research and Surveillance Programs**: Admit to the illegitimate coercion of the patients into the two 2024 JAMA studies, and retract them, alerting the public of the incorrect medical conclusion made in the IC 2024 Report based on the now deemed unreliable NIH studies.NIH should launch a new protocol specifically for civilians, or a combined cohort, to prospectively study health effects in this population. In addition, NIH should assist in creating or supporting a national civilian AHI registry (in collaboration with CDC) to systematically collect data on these cases. This registry/study should capture clinical evaluations, exposure histories, and outcomes of civilian patients, paralleling the data collected on government cases. All data should be analyzed in aggregate to identify any differences or commonalities between civilian and government cases.

3. **Publication of Clinical Evaluation and Diagnostic Guidelines (for Civilian Healthcare Providers)**: Leverage NIH's clinical expertise by publishing or co-developing diagnostic and management guidelines for Havana Syndrome that can be used by civilian healthcare providers. While CDC is being petitioned to officially issue guidance, NIH's unique knowledge from evaluating dozens of AHI patients can greatly inform best practices. We ask NIH to publish in a peer-reviewed journal or an NIH white paper the findings and recommended clinical approach from its AHI program – for example, outlining what tests proved most useful (balance tests, vestibular exams, neurocognitive batteries, etc.) and how to differentiate AHI effects from other conditions. This guidance should also detail supportive treatments or interventions (e.g. vestibular therapy for balance issues, counseling for PTSD symptoms, etc.) that NIH clinicians have found beneficial for AHI patients. By disseminating this knowledge, NIH will empower community physicians to better recognize and care for new cases.

4. **Training and Outreach to the Medical Community and Public Health Officials**: Utilize NIH's platform to educate and alert medical professionals about Havana Syndrome/AHI in civilians. This could include organizing webinars, conference presentations (via NINDS or other Institutes), or inter-agency workshops to share knowledge on the topic. State public health officials and epidemiologists should also be looped in through HHS coordination, so they understand the NIH resources available for suspected cases. Essentially, NIH should make it known that expert evaluation is available for civilians: for example, NIH could set up a referral pathway where physicians who have a potential civilian AHI case can consult with NIH experts or refer the patient to NIH's Clinical Center for work-up. Such outreach ensures front-line doctors aren't left in the dark and that promising cases for study are routed appropriately.

5. **Provision of NIH Clinical Care and Treatment Protocols to Civilian Patients**: Ensure that civilian Havana Syndrome patients have access to the same cutting-edge clinical evaluations, experimental treatments, and multidisciplinary care that federal employees receive. In practice, this means opening the NIH Clinical Center's doors to civilians who qualify as Havana Syndrome cases, either as research participants or on a compassionate care basis. It also means sharing any treatment protocols or case management strategies that have been developed for government victims. For instance, if federal patients have received tailored vestibular rehabilitation exercises, cognitive rehabilitation, pharmacological interventions for symptom management, or novel therapies (such as neuromodulation techniques), these should be made available or at least recommended to civilian doctors treating AHI patients. We further request NIH to consider sponsoring or funding clinical trials targeted at AHI recovery, explicitly including civilians. In short, civilian victims should not be relegated to inferior care simply because of their civilian status. NIH's mandate to improve health extends to all Americans, and this emerging injury should be no exception.

These actions, taken together, will position NIH as a leader in addressing the full scope of Anomalous Health Incidents. Not only will this advance the science (by incorporating a broader subject pool), but it will also demonstrate NIH's commitment to equity in healthcare. We urge that these steps be initiated immediately, given that civilians continue to report new incidents (several new diagnoses have been brought to our attention in 2025 alone).

In addition to this formal petition, there is a public petition hosted on Change.org – *"CDC & NIH: Recognize, Track, and Investigate Diagnosed Civilian Havana Syndrome / AHI Cases"* – which has drawn growing support from members of the general public across the United States:

(https://www.change.org/p/cdc-nih-recognize-track-and-investigate-diagnosed-civilian-havana-syndrome-ahi-cases).

This broad-based civic effort reflects the urgency and seriousness with which ordinary Americans view this matter. The public petition underscores that concern about AHIs is not confined to a handful of affected individuals or advocacy groups, but represents a widespread call for the CDC and NIH to act transparently, to acknowledge the condition, and to fulfill its duty to track and investigate civilian cases of Havana Syndrome/AHI. The alignment of both an official organizational petition and a grassroots public petition highlight the depth of national concern and strengthens the moral imperative for the CDC and NIH to respond.

**Submission and Acknowledgment**

Method of Submission: This petition is being submitted to the NIH Office of the Director via formal letter (delivered by certified mail for tracking) and via email to the Director's office. Copies are also being sent to the Director of NINDS – given that Institute's expertise in neurological disorders – and to the NIH Office of Science Policy, which coordinates NIH's response to emerging health issues. In addition, for public transparency, we are releasing this petition through the federal FOIA online portal and providing it to relevant Congressional committees and the press. These steps are taken to ensure the petition is received and duly recorded.

Acknowledgment Requested: We respectfully request that NIH acknowledge receipt of this petition in a timely manner, and inform us of any initial steps NIH will take in response. A public acknowledgment (for example, a statement that NIH is examining the issue of civilian AHI cases) would be appreciated and would reassure the affected community that their voices are heard. We also request, if feasible, a meeting or briefing between NIH officials and representatives of Targeted Justice (and/or the civilian patients' physicians) to discuss how best to implement the above recommendations. We are prepared to assist NIH by facilitating contact with civilian patients who can contribute data or by sharing our registry information under appropriate privacy protections.

This petition is submitted as part of the public record and will be referenced in impending civil litigation involving nine civilian Havana Syndrome victims. We sincerely hope NIH will act proactively, thereby potentially reducing the need for judicial remedies. The petitioners intend to keep Congressional stakeholders informed of NIH's response to this appeal, especially those in oversight roles who have expressed concern about anomalous health incidents. NIH's positive engagement would likely be viewed favorably in that oversight context.

Finally, we note that the media and public are closely watching how federal health institutions respond to Havana Syndrome reports. In the interest of public confidence, we urge NIH to handle this petition with transparency and a demonstrated commitment to scientific rigor and compassion for those afflicted.

**Conclusion**

In conclusion, Targeted Justice calls upon the NIH to extend its research and clinical expertise on "Havana Syndrome" to include and benefit civilian Americans. The evidence is clear that civilians have been harmed by AHIs, just as government personnel have. By formally recognizing these civilian cases and taking the actions outlined – from including civilians in studies to sharing clinical guidance and care – NIH will fill a critical gap in the national response. These steps will advance our understanding of AHIs and offer hope and help to suffering individuals who have so far been left without institutional support.

We appreciate your consideration of this petition. NIH's leadership is crucial to solving the medical mystery of Havana Syndrome and protecting all who are affected by it. We are hopeful that under your direction, NIH will rise to this challenge.

Thank you for your time and attention. We look forward to your acknowledgment and a constructive path forward.

Sincerely,

*Targeted Justice, Inc.*



Len Ber MD (Medical Director, Targeted Justice, Inc.)
On behalf of Targeted Justice, Inc. and the civilian AHI plaintiffs

Enclosures/Exhibits:

- **Exhibit A**: Collecting Information on Diagnosed Cases of "Havana Syndrome" and its Anomalous Health Incidents (AHI) among Civilians Occurring on US Soil' (Targeted Justice, January 2025)
- **Exhibit B**: March 3, 2025 CDC FOIA Response

- **Exhibit C**: August 2025 Physician Communication to State Health Department

# EXHIBIT A

# Collecting Information on Diagnosed Cases of "Havana Syndrome" and its Anomalous Health Incidents (AHI) among Civilians Occurring on US Soil

Interim Report by Len Ber, MD, Global Medical Leader and Board Member for Targeted Justice, Inc., a nonprofit 501(c)(3) organization.

January 2025

**LIST OF ABBREVIATIONS**

| | |
|---|---|
| AHI | Anomalous Health Incidents |
| CDC | Center for Disease Control |
| CNS | Central Nervous System |
| CRHS | Civilian Registry for diagnosed Havana Syndrome and its AHI |
| DHA | Defense Health Agency |
| DOD | Department of Defense |
| EM Energy | Electromagnetic Energy |
| GAO | Government Accountability Office |
| HAVANA Act | Helping American Victims Afflicted by Neurological Attacks Act of 2021 |
| HS | Havana Syndrome |
| IC | Intelligence Community |
| MHS | Military Health System |
| mTBI | Mild Traumatic Brain Injury |
| NAS | National Academy of Sciences |
| NIH | National Institute of Health |
| NKBI | Non-Kinetic Brain Injury |
| US | United States |

**This report is prepared by Targeted Justice, Inc., a nonprofit 501(c)(3) organization for victims of Pulsed Electromagnetic Weapons, and the world's largest and most visited depository of information on the subject matter, TargetedJustice.com.**

**INTRODUCTION**

The Civilian Registry for diagnosed Havana Syndrome victims (CRHS) was established in August of 2024 for the purpose of facilitating tracking and investigation into the prevalence of HS and its acute episodes known as AHI on US soil. The need for creating this registry was prompted by the lack of effort on the side of the US government and US health agencies to monitor and investigate this condition among the general public.

In July of 2024, the US GAO issued a report, "Havana Syndrome: Better Patient Communication and Monitoring of Key DOD Tasks Needed to Better Ensure Timely Treatment" (GAO-24-106593).[1] In this report, GAO reviewed the DOD's efforts to facilitate AHI patients' access to the MHS and develop an AHI Registry:

> Of 334 AHI patients who had qualified for care in the MHS in January 2024, only 33 had been entered in the AHI Registry as of May 2024.

The scope of the GOA report and the DOD's AHI Registry is limited to US government employees and their family members, including children.

> Department of Defense officials estimated that about 15 children had received Secretarial Designation for AHIs as of December 2023.

The report discovered multiple deficiencies in the way DOD manages AHI patients and their accessibility to care, and makes several recommendations to the Director of DHA regarding issuing diagnostic guidance, communicating and implementing care for AHI patients, and developing a plan to gather AHI Trauma Registry consent from individuals who have finished their care in the MHS. No recommendations are made regarding civilian AHI or AHI Trauma patients.

The report makes a distinction between AHI and AHI Trauma because the latter would make patients eligible for a one-time compensation under the HAVANA Act of 2021, and its amended implementation. The final interim rule that went into effect in May 2024 makes DOD employees and their dependents with "qualified injury" eligible for compensation under the Act.

The report suggests that the mechanism behind AHI is unknown:

> "…the precise nature and causes of AHIs remain under investigation…"
>
> "…AHI is a new, unknown condition…"
>
> "…DOD is offering treatment for a poorly understood condition with unknown causes…"

The report also suggests using HS and AHI interchangeably.

> "These events, first labeled 'Havana Syndrome,' are now referred to as AHIs…"

It is our understanding, which coincides with the sentiment expressed in the scientific literature, that the episodes are better described as “Anomalous Health Incidents ***of*** the Havana Syndrome” (emphasis ours)(Giordano, 2022).[2] Despite the narrative that this is a condition with unknown etiology, there are two Scientific Consensus Reports that converge on the prevailing hypothesis that these incidents are caused by exposure to “directed pulsed RF Energy in the MW range” (NAS Consensus Report, 2020),[3] (IC Expert Panel Assessment Report, 2022).[4]

> Four “core characteristics”…of AHIs: (1) the acute onset of audio-vestibular sensory phenomena, including sound and/or pressure, sometimes in only one ear or on one side of the head; (2) other nearly simultaneous signs and symptoms such as vertigo, loss of balance, and ear pain; (3) a strong sense of locality or directionality; and (4) the absence of known environmental or medical conditions that could explain the reported signs and symptoms.

The four “core characteristics” are best explained by the phenomenon of coupling brain activity to external EM pulses, also known as brain entrainment, with findings commonly occurring during and post-concussion. However, given the absence of mechanical (kinetic) injury to the brain in AHI, the causative mechanism should be classified as non-kinetic, thus yielding Non-Kinetic Brain Injury, or NKBI (Ber, 2025).[5]

In this sense, the term “Havana Syndrome” means a chronic condition that encompasses multiple AHIs, including ongoing AHIs. It is suggested to be identified as Non-Kinetic Brain Injury, Non-Kinetic Brain Encephalopathy, or as the report suggests, “AHI Trauma.” Based on this framework, we chose “Havana Syndrome” or its equivalent diagnosis, rather than AHI only, to be tracked in the Civilian Registry.

## THE NEED FOR A CIVILIAN REGISTRY

There is an urgent need for the US Government to acknowledge, track, and investigate diagnosed cases of “Havana Syndrome” among civilians beyond the DOD Registry, which is limited to federal employees and their families only. Despite the AHIs being painful and debilitating, there is a grave decline in the CNS cognitive function among the victims. Unlike encephalopathy from kinetic trauma, Non-Kinetic Brain Injury appears to be permanent and tends to get worse with time, especially when AHIs are ongoing, as with many domestic cases.

It’s a matter of public safety and public health, with children being affected as well as adults. The CDC has neglected to detect, track, investigate, and address these cases. The Civilian Registry is set to correct this critical situation.

To the best of our knowledge, as of January 1, 2024, there are about 30 civilian patients diagnosed by physicians with "Havana Syndrome" (or equivalent). Only seven patients volunteered to submit their information to the Civilian Registry claiming fear of government persecution and retaliation. This must alert lawmakers and US health officials to the gravity of the situation.

An Interim Report by Chairman Rick Crawford of the Subcommittee on the Central Intelligence Agency titled "Investigating the Intelligence Community's Conclusions on Anomalous Health Incidents: Is the Intelligence Community Hiding the Real Reason for This Phenomenon?" issued in December of 2024[6] unequivocally points fingers at the IC (specifically the CIA):

> The IC's inconsistent approach has had detrimental effects on IC personnel, trust in the IC by policymakers, the understanding of the American public, and perceptions of the IC by both foreign allies and adversaries.
>
> The mishandling of the IC's response to AHIs has hampered the IC's ability to collect against developing threats, delayed development of potential mitigations, and harmed the credibility the IC has with its workforce.

During the May 2024 Subcommittee on Counterterrorism, Law Enforcement, and Intelligence hearing entitled "Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad," Representative Daniel Goldman asked the witnesses present at the hearing:

> "Are any of you aware of any reported incidents from the individuals who are not members of the US Government, domestically, I should say?"

Both witnesses (Ret. Col. Gregory Edgreen and Attorney Mark Zaid) were unable to answer this question, claiming that they only work with federal employees. So, the question remained unanswered. It is obvious that this important question should be addressed to the experts and the organization that tracks these validated cases among civilians. We believe that this organization is the nonprofit Targeted Justice, Inc., whose mission is to document and expose the use of EM weapons against the civilian population. Specifically, the Civilian Registry for diagnosed victims of "Havana Syndrome" and its AHIs holds the answers. The Registry is organized and maintained by an MD in his role of Global Medical Leader and Board Member for Targeted Justice.

The IC has been investigating AHI and "Havana Syndrome" since at least 2016, and 9 years later, the American public still doesn't have the answers while the reports are pouring in that the IC itself is an obstacle in this investigation. It's time for Congress to look for unconventional suspects and use different methods of investigating this technological atrocity.

Just how debilitating are the AHIs? A quote from an article in a peer-reviewed medical journal provides a first-person perspective[6]:

> To power through the most severe attacks, I would scream in order to "push" against extremely painful sensation of buffeting (vibrational pressure pain). It feels as if your head is being squeezed in a vibrating vise. You can't talk or perform cognitive tasks—if you try, your brain feels scrambled and foggy. You can't walk—if you try, you lose balance.

In a lawsuit filed by Mark Zaid in December of 2024,[8] ongoing AHI attacks are described as below:

> She continues to suffer recurring incidents of pain that last anywhere from 20 minutes to an hour. The pain is so severe that she likens it to the pain of giving birth.

The American public deserves to know that not only federal employees but also regular civilians including children are being remotely and painfully attacked on US soil, and their health and cognition are being intentionally degraded.

**DATA COLLECTION, PRESENTATION, AND ANALYSIS**

Civilians who are diagnosed by licensed physicians with AHI, "Havana Syndrome," or its equivalent (traumatic brain injury or encephalopathy, specifically Non-Kinetic Brain Injury) submitted their data voluntarily to the Civilian Registry, starting in August 2024. Privacy of their sensitive information has been guaranteed, and cannot be shared with a third party without the volunteers' explicit consent.

Among the seven civilian cases listed in the Registry, there are three males, four females, and one child. Average age of adults is 56 years, ranging from 43 to 71.

States of residence and the number of diagnosed cases as follows: AR-1, IL-1, CO-2, NY-1, and RI-1. Diagnoses were made between 2020 and 2024.

Out of seven listees, one has received disability due to the diagnosis of Traumatic/Non-Kinetic Encephalopathy (no history of concussion). The diagnosis of the victim on disability has been verified by two experts in the subject matter, and the case was submitted to the DOD for further investigation—no investigation was conducted.

Five out of seven patients submitted their cases to the FBI for investigation—the agency refused to investigate their cases. All patients contacted their US senators and representatives, to no avail.

**CONCLUSION**

“Havana Syndrome,” or Non-Kinetic Brain Injury, or Non-Kinetic Encephalopathy, or AHI Trauma is a growing public health and safety concern flying under the radar of US Government officials, Congress, health agencies, and law enforcement. It remains undetected and undiagnosed, and has not triggered any investigative efforts, research, or the analysis it deserves. There is no relevant information regarding methods of detection, shielding, diagnostic guidance, and management offered to the American public with respect to this urgent health threat.

Besides AHI being extremely debilitating, the long-term consequences of these attacks are even more worrisome and include progressive neuro-cognitive debilitation of the victims’ CNS.

The present report provides a summary of physician-diagnosed cases of “Havana Syndrome” and its AHIs among civilians attacked on US soil who are not federal employees or their dependents. This is the first of its kind effort to fill gaps in our knowledge and decisively answer critical questions raised by the members of the House Subcommittee on Counterterrorism, Law Enforcement, and Intelligence during the May 8, 2024, hearing “Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad”[7]:

> Are there any civilian victims of AHI and the Havana Syndrome who are not federal employees or their dependents?

**RECOMMENDATIONS**

This matter is of the utmost urgency. The US Congress must be informed of the content of this report and act immediately.

Initial steps must entail:

1. For the CDC
    a. To inform Health Departments across the country and start tracking “Havana Syndrome” or equivalent diagnoses
    b. To issue diagnostic guidance for practitioners
    c. To educate the public about this condition
    d. To initiate NIH research into this condition in the civilian population
2. For Law Enforcement
    a. To track diagnosed civilian cases
    b. To investigate diagnosed civilian cases
3. For Congress
    a. To establish a direct line of communication with Targeted Justice, Inc., and its experts

b. To create immediately a multidisciplinary “Havana Syndrome” Civilian Emergency Investigative Task Force and report back to Congress within a month!
c. To inform the general public about the efforts Congress is making
d. To develop a comprehensive plan on how to handle this critical health issue, including enacting appropriate laws

**REFERENCES**

1. *Havana Syndrome: Better Patient Communication and Monitoring of Key DOD Tasks Needed to Better Ensure Timely Treatment*, US Government GAO-24-106593, July 29, 2024. https://www.gao.gov/products/gao-24-106593.
2. Giordano, J., DiEuliis, D. (2022). *Anomalous Health Incidents of the Havana Syndrome: Implications and Lessons for Global Biosecurity and Defense*. Academia Letters, Article 5138, https://doi.org/10.20935/AL5138.
3. National Academies of Sciences, Engineering, and Medicine. 2020. *An Assessment of Illness in U.S. Government Employees and Their Families at Overseas Embassies*. Washington, DC: The National Academies Press. https://doi.org/10.17226/25889.
4. IC Experts Panel Assessment, *Anomalous Health Incidents: Analysis of Potential Causal Mechanisms*, September 2022, https://media.salon.com/pdf/22-cv-674%20Final%20Response%20Package.pdf.
5. Ber, L., *Helping Physicians to Understand “Havana Syndrome” and a Novel Method of Managing AHIs*, Advanced Medical Sciences: An International Journal (AMS), Vol. 12, No.1, February 2025, https://doi.org/10.5121/ams.2024.12101.
6. *Investigating the Intelligence Community’s Conclusions on Anomalous Health Incidents: Is the Intelligence Community Hiding the Real Reason for This Phenomenon?* Interim Report by Chairman Rick Crawford of the Subcommittee on the Central Intelligence Agency of the House Permanent Select Committee on Intelligence, December 2024. https://intelligence.house.gov/uploadedfiles/unclassified_ahi_report.pdf.
7. A Subcommittee on Counterterrorism, Law Enforcement, and Intelligence hearing entitled *“Silent Weapons: Examining Foreign Anomalous Health Incidents Targeting Americans in the Homeland and Abroad.”* May 8, 2024. https://homeland.house.gov/hearing/silent-weapons-examining-foreign-anomalous-health-incidents-targeting-americans-in-the-homeland/.
8. In US District Court for the District of Columbia, *AFSA v. DOS*, Case 1:24-cv-03385-AHA, Filed December 4, 2024. https://www.pacermonitor.com/public/case/56062763/AMERICAN_FOREIGN_SERVICE_ASSOCIATION,_et_al_v_US_DEPARTMENT_OF_STATE.

# EXHIBIT B

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30333

March 3, 2025

Leonid Ber
MuckRock News DEPT MR 175938
263 Huntington Ave
Boston, MA 02115
Via email: 175938-80458607@requests.muckrock.com

Dear Mr. Ber:

This letter is our final response regarding your Centers for Disease Control and Prevention and Agency for Toxic Substances and Disease Registry (CDC/ATSDR) Freedom of Information Act (FOIA) request of November 6, 2024, assigned #25-00184-FOIA, for:

> *Any and all document, list, registry, memoranda related to tracking, investigating, and analyzing AHI (Anomalous Health Incidents) and "Havana Syndrome" among the US population.*
>
> *It is public knowledge that AHI and Havana Syndrome are tracked in the AHI Registry, but it is limited to federal employees and their dependents only: https://www.gao.gov/products/gao-24-106593*
>
> *The purpose of this FOIA request is to access any and all documents, lists, registry, memoranda dated January 1, 2018 to November 1, 2024 produced by and circulated within CDC related to tracking , investigating, and analyzing AHI and Havana Syndrome in both federal employees and their dependents, and in civilian adults and children.*

We received your modified scope dated February 18, 2025, which you narrowed the scope as follows:

1. *Pursuant to the Freedom of Information Act, I hereby request the following records: Any and all document, list, registry, memoranda related to tracking, investigating, and analyzing AHI (Anomalous Health Incidents) and 'Havana Syndrome' among the US population, which involves the United States (U.S.) residents with domestic incidents on U.S. soil.*

2. *The purpose of this FOIA request is to access any and all CDC documents, lists, registry, memoranda dated January 1, 2018 to November 1, 2024 produced by and circulated within CDC related to tracking, investigating, and analyzing AHI and Havana Syndrome among the US population, which involves the United States (U.S.) residents with domestic incidents on U.S. soil.*

   *You suggested that the "incidents" listed above may be listed as non-kinetic directed electromagnetic pulse energy weapon.*

The Office of Safety, Security, and Asset Management (OSSAM) located nine pages of responsive records (Eight pages released in part; one page withheld in full).

After a careful review of these pages, some information was withheld from release pursuant to 5 U.S.C. §552 Exemptions 5 and 6. The foreseeable harm standard was considered when applying these redactions.

Exemption 5 protects inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. Exemption 5 therefore incorporates the privileges that protect materials from discovery in litigation, including the deliberative process, attorney work-product, and attorney-client privileges. Information withheld under this exemption was protected under the deliberative process privilege. The deliberative process privilege protects the decision-making process of government agencies. The deliberative process privilege protects materials that are both predecisional and deliberative. The materials that have been withheld under the deliberative process privilege of Exemption 5 are both predecisional and deliberative, and do not contain or represent formal or informal agency policies or decisions. Examples of information withheld include a draft AHI guidance document.

Exemption 6 protects information in personnel and medical files and similar files when disclosure would constitute a clearly unwarranted invasion of personal privacy. The information that has been withheld under Exemption 6 consists of personal information, such as staff email addresses. We have determined that the individuals to whom this information pertains has a substantial privacy interest in withholding it.

Additionally, the Office of Readiness and Response (ORR) search failed to reveal any documents pertaining to your request. Specifically, the ORR searched using the above information but found no records. OFF advised that the CDC has not developed a registry for AHI. The registry referenced in this request is maintained by Department of Defense (DOD). You may wish to reach out to the DoD at the following weblinks:

https://www.foia.gov/agency-search.html?id=35f2f6b9-28a6-448e-b61a-806d2bb3b3af&type=agency and/or
https://www.foia.gov/agency-search.html?id=a777d907-fa12-42d3-869d-586db19ec290&type=component

You may contact our FOIA Public Liaison at 770-488-6246 for any further assistance and to discuss any aspect of your request. Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with the response to this request, you may administratively appeal to the Deputy Agency Chief FOIA Officer, Office of the Assistant Secretary for Public Affairs, U.S. Department of Health and Human Services, via the online portal at https://requests.publiclink.hhs.gov/App/Index.aspx. Your appeal must be electronically transmitted by Monday, June 2, 2025.

Sincerely,

Roger Andoh
CDC/ATSDR FOIA Officer
Office of the Chief Operating Officer
Phone: (770) 488-6399
Fax: (404) 235-1852
Email: foiarequests@cdc.gov

25-00184-FOIA

Outlook

## Accepted: AHI pre-brief with HHS ONS & OASH

| | |
|---|---|
| **Organizer** | Bornstein, Josh (CDC/OCOO/OSSAM/OD) <dsx2@cdc.gov> |
| **Meeting time** | This event occurred 1 year ago (Wed 2/1/2023 11:00 AM - 12:00 PM) |
| **Location** | SCIF; (CDC to link with HHS) |
| **My response** | Accepted |
| **Required attendees** | Bornstein, Josh (CDC/OCOO/OSSAM/OD), Houry, Debra E. (CDC/DDNID/NCIPC/OD), Iademarco, Michael (HHS/OASH), Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO), [redacted] (b)(6) (CDC/OCOO/OSSAM/PHIO), Linden, Gregory (CDC/OCOO/OSSAM) (pbx7@cdc.gov), Vagi, Sara J. (CDC/DDPHSIS/CPR/DEO) |
| **Optional attendees** | CDC CSO (CDC), Trapp, Jonathan (CDC/OCOO/OSSAM), Fussell, Timothy J. (CDC/OCOO/OSSAM/PHIO) |
| **Message sent** | Fri 1/6/2023 5:15 PM |

Outlook

## AHI

**From** Bornstein, Josh (CDC/OCOO/OSSAM/OD) <dsx2@cdc.gov>
**Date** Tue 8/23/2022 4:47 PM
**To** Bertulfo, Joseph (CDC/OCOO/OSSAM/OHSO) <bwn8@cdc.gov>
**Cc** Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO) <tdv0@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]; Linden, Gregory (CDC/OCOO/OSSAM/OD) <pbx7@cdc.gov>; Prigodich, Cheryl (CDC/OCOO/OSSAM/OD) <iqz8@cdc.gov>

1 attachment (130 KB)
CDC-AHI Message 6-4-21^jb.docx;

Joe,

As acting OHC director, this is something you should know about. Anomalous Health Incidents (AHI – also referred to as Havana Syndrome) have been reported in USG employees working overseas and stateside. No CDC has reported a case to OHC. However, if one is reported, you should notify Demetri, [redacted] and me ASAP since there are national security reporting protocols that are required. You can call me if it happens and I will walk you through next steps.

The attached describes symptoms and is what went to all OCONUS staff last summer.

Please remind providers about this reporting requirement (they report to you, you let us know).

Thanks,
Josh

Read more:
Federal Register :: Implementation of HAVANA Act of 2021

'Havana Syndrome' symptoms in small group most likely caused by directed energy, says U.S. intel panel of experts (nbcnews.com)

Restricted Use/All CDC Staff

Outlook

## DNI's AHI assessment on this side of the house

**From** [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]

**Date** Fri 3/10/2023 11:37 AM

**To** PHMIT (CDC) <phmit@cdc.gov>; CDC OD OCOO OSSAM phio GST <ODOCOOOSSAMphioGST@cdc.onmicrosoft.com>; Vacalis, Demetri (CDC/OCOO/OSSAM/PHIO) <tdv0@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]

[redacted]

Outlook

## Fwd: A Message from NSC on Anomalous Health Incidents

**From** [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]
**Date** Fri 3/25/2022 5:23 PM
**To** [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]

The AHI message was launched to CGH staff.

---

**From:** Pestorius, Ted (CDC/DDPHSIS/CGH/OD) <fpp0@cdc.gov>
**Sent:** Friday, March 25, 2022 5:20:36 PM
**To:** CDC CGH OD Overseas Country Deputy Directors <CDCCGHOverseasDeputyChiefofParty@cdc.gov>; CDC CGH Overseas Country Directors <CDCCGHOverseasChiefofParty@cdc.gov>
**Cc:** Chao, Viviane (CDC/DDPHSIS/CGH/OD) <yuj2@cdc.gov>; Chong, Patrick (CDC/DDPHSIS/CGH/OD) <pec8@cdc.gov>; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted]; [redacted] (CDC/OCOO/OSSAM/PHIO) [redacted] Pumphrey, Heather (CDC/DDPHSIS/CGH/DGHT) <hbp7@cdc.gov>; Kay, Kelly L. (CDC/DDPHSIS/CGH/DGHP) <klr4@cdc.gov>; Swezy, Virginia (CDC/DDPHSIS/CGH/GID) <vcs3@cdc.gov>; Young, Joni (CDC/DDPHSIS/CGH/DPDM) <gzc8@cdc.gov>
**Subject:** A Message from NSC on Anomalous Health Incidents

All- please share this with all CDC USDH staff in your country. Thanks, Ted

# CDC Anomalous Health Incidents (AHI) Guidance

The U.S. Government is pursuing a rigorous and sustained government-wide response to anomalous health incidents (AHI) and remains committed to providing access to care for affected personnel.
The health and the welfare of all members of our workforce and their dependents are paramount. As we learn more, we want to make sure the workforce has up-to-date information, including guidance on how to respond if you are concerned that you or a dependent have experienced an incident and how to access medical care.

Workforce reporting remains critical to the U.S. Government's ongoing efforts to examine and understand the causes of reported incidents and provide access to care for those who need it. Experiences and symptoms individuals have reported are real, and we are committed to ensuring that all personnel can report suspected incidents without stigma, even if reported incidents may ultimately be due to alternative causes.

If you suspect that you are experiencing sensations associated with an AHI:

- Current response protocols recommend leaving the immediate location as quickly as you are safely able to do so, and noting whether the sensations abate when you do so
- Most importantly, if you are experiencing acute medical symptoms, you should immediately seek medical care. (Individuals affected by a possible AHI typically report a sensory event, such as sound and/or pressure, concurrent with the rapid onset of physical symptoms, to include ear pain or pressure, nausea, disequilibrium, and/or executive dysfunction for which there is no readily apparent explanation)

- Promptly get to a secure government facility—your field site, the Embassy, etc—and follow Embassy protocols for reporting the AHI to Embassy or post health unit

- Also complete the CDC/ATSDR Incident Report and notify OSSAM's Occupational Health Clinics | OSSAM (cdc.gov) directly at 001-404-639-3385.

We want to emphasize that these events are rare. While the symptoms are not unique to AHI, it is important that if you experience an unusual sensation as described above, followed by one or more of the symptoms, it is better to err on the side of caution and report it.

Your health and safety are our top priority. CDC is committed to the safety and well-being of all of our personnel and is working in close partnership with the President's AHI Interagency Coordinator and the broader government-wide effort to ensure the full resources of the U.S. Government are brought to bear to get to the bottom of these incidents and ensure access to needed care.

Ted Pestorius, MPA
Deputy Director
Management and Overseas Operations
Center for Global Health/CDC

404-579-1250



# CDC Anomalous Health Incidents (AHI) Guidance

(b)(5)

[redacted]

PRE-DECISIONAL/DELIBERATIVE

OSSAM Office of Safety, Security, and Asset Management

(b)(5)

[redacted]

PRE-DECISIONAL/DELIBERATIVE

(b)(5)

[redacted]

**Office of Safety, Security, and Asset Management (OSSAM)**

OSSAM@cdc.gov

http://intranet.cdc.gov/ossam

**Services. Support. Solutions.**

OSSAM Office of Safety, Security, and Asset Management

(b)(5)

[redacted]

# EXHIBIT C

Howard Brown Health

HBH HALSTED
3501 N HALSTED ST
CHICAGO IL 60657-1832
Phone: 773-388-1600
Fax: 773-296-8401

Date: Aug 28, 2025

To: State Epidemiologist

Illinois Department of Public Health (IDPH)
525-535 West Jefferson Street
Springfield, IL 62761

**Subject: Request for public-health assistance for a civilian patient with diagnosed AHI/ "Havana Syndrome" in Bloomingdale, Illinois**

Dear State Epidemiologist,

I am writing as the treating physician for a civilian patient under my care diagnosed with **Anomalous Health Incidents (AHI)**, commonly referred to as "Havana Syndrome." I am requesting IDPH's assistance with case acknowledgment, surveillance guidance, and coordination of any appropriate environmental/forensic assessment.

**Patient (de-identified) summary**

- **Patient:** Adult, age 60, resident of Bloomingdale, IL (non-federal civilian).
- **Onset:** Acute Onset Incidents started in 2019 and continuing to this date at patient's residence.
- **Symptoms:** Sudden vibrating pressure in the head, tinnitus, dizziness/vertigo, imbalance, cognitive fog, nausea.
- **Exam/Testing to date:** Diagnosed using neurological and vestibular tests by an expert at University of Miami, Dr. Micheal E. Hoffer, confirmed by neuroweapon expert James Giordano, diagnosed with traumatic encephalopathy, two severely abnormal qEEG with swLoreta.
- **Differential considered/excluded:** Stroke, infectious etiologies (including otologic/vestibular), toxic exposures (CO/solvents/metals), concussion, primary migraine disorder, psychiatric causes.
- **Current status:** Persistent vestibular/sensory/auditory/cognitive symptoms impacting function. Vestibular rehabilitation unsuccessful (2 attempts)

**Why I'm contacting IDPH**

Given (1) the acute, unusual symptom constellation; (2) diagnosis made and confirmed by AHI experts, (3) absence of an alternative diagnosis after appropriate workup, and (4) the potential for other unrecognized cases in the community, I believe this presentation warrants public health attention.

“It is now widely accepted that directed energy exposure is the most probable cause” of AHI*. (James Giordano., et al. “Assessing Anomalous Health Incidents of “Havana Syndrome”: Potential Utility - and Issues - of Using Modular Integrated Artificial Intelligence”. EC Neurology 17.4 (2025): 01-08.)*

**Requests to IDPH**

1. **Case consultation & reporting guidance.** Please advise on the use of an AHI-aligned case definition for civilians in Illinois and the appropriate state reporting pathway.
2. **Syndromic surveillance pilot.** I request that you consider exploring a pilot query within Illinois's participation in CDC's National Syndromic Surveillance Program (NSSP/BioSense) to

flag potential AHI-like emergency-department presentations.

3. **Escalation criteria.** Please advise on thresholds for requesting CDC assistance (e.g., an Epi-Aid) if additional cases are identified or if analytic epidemiology becomes warranted.
4. **Data sharing & privacy.** My patient is willing to provide clinical information directly or he intends to share his medical record in an explicit release to you for this purpose if you request that.

My patient and I appreciate your consideration of this request, and stand ready to collaborate with IDPH on next steps if you agree that this is something appropriate for IDPH to be tracking.

Sincerely,

Eric Christoff MD
3501 N. Halsted St
Chicago IL 60657

Phone (773) 388-1600 | Fax 773 296 8410| Email
ericc@howardbrown.org

MyChart® licensed from Epic Systems Corporation© 1999 - 2025